IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2010-NMSC-031

Filing Date:  June 22, 2010

Docket No. 31,637

JACKIE AKINS,

    Plaintiff-Respondent,

v.

UNITED STEEL WORKERS OF AMERICA,
AFL-CIO, CLC, LOCAL 187,

    Defendant-Petitioner.

**ORIGINAL PROCEEDING ON CERTIORARI**
Gary L. Clingman, District Judge

Youtz & Valdez, P.C.
Shane Youtz
Albuquerque, NM

Richard J. Brean
Pittsburgh, PA

for Petitioner

Law Offices of W.T. Martin, Jr., P.A.
Wilfred T. Martin, Jr.
Lane T. Martin
Carlsbad, NM

for Respondent

**OPINION**

**BOSSON, Justice.**

**{1}** In virtually all claims sounding in tort, our common law permits punitive damages where appropriate to punish outrageous conduct and to deter similar conduct in the future.

Similarly, in New Mexico all labor unions owe a common-law duty of fair representation (also referred to herein as "DFR") to their members and are subject to suit for breach of that duty. In the case at bar, we are asked to limit that liability by imposing a per se exclusion of punitive damages much as the U.S. Supreme Court has done for similar actions against federally regulated labor unions. We decline to do so, and instead underscore the important public policy served by punitive damages as part of our state common-law jurisprudence. Our ruling today expands upon and clarifies that of our Court of Appeals, affirming its holding that punitive damages should be available in DFR suits where the union's conduct is malicious, willful, reckless, wanton, fraudulent or in bad faith.

## BACKGROUND

**{2}** Respondent Jackie Akins (Akins) worked for the City of Carlsbad (City) from 1992 until 2002. During this time, Akins was a dues-paying member of Petitioner United Steelworkers of America, AFL-CIO, Local 187 (the Union), which served as Akins' exclusive collective bargaining representative. Akins was the only African-American member of the Union.

**{3}** In 1999 Akins began working in the City's lube room, where he was responsible for changing oil on city vehicles, and similar duties. During his employment there, Akins' coworkers regularly spoke in Spanish, and his supervisor Carmen Vasquez gave him orders in Spanish, despite the fact that Akins did not speak Spanish. Akins was told he needed to learn. At trial, Akins testified that various coworkers, some of them with supervisory authority, used racial slurs in his presence. Specifically, Akins testified that the term "pinche miyate [sic]," which Akins understood to mean "fucking nigger" in Spanish, was uttered on two or three occasions when he was the only black person present.[1] Akins' understanding of the meaning of the term was not refuted.

**{4}** Akins made repeated requests to Union officials to address the problem. When Akins complained to Union President Danny Armendariz, asking him to file a grievance, Armendariz told him he was the "wrong color" and that he needed to learn to speak Spanish. The Union refused to file a grievance for racial discrimination on Akins' behalf.

**{5}** Akins testified that because of the racially hostile environment at the lube room, he accepted an option to transfer to the solid waste department in April 2001, taking a pay cut

[1] The record does not support the Court of Appeals' assertion that "pinche miyate [sic]" means "fucking nigger." *Akins v. United Steel Workers of Am. Local 187*, 2009-NMCA-051, ¶ 3, 146 N.M. 237, 208 P.3d 457. The only evidence of the meaning of that term came from Akins, who admitted that he does not speak Spanish. Similarly, the Court of Appeals asserted that Akins' coworkers referred to him by the term "nigger." *Id.* ¶ 26. Again, the only testimony on this specific issue came from Akins, and his testimony suggested that he was unsure whether the comments were directed at him.

in the process. Akins discontinued his employment with the City in July 2002, due to decreased but continuing racial discrimination.

**{6}** Subsequently, in March 2004, Akins filed suit against the Union and the City for two counts of breach of the Union's duty of fair representation, and one count each of intentional infliction of emotional distress and prima facie tort, based on the conduct described above. Akins reached an agreement with the City, and the City was dismissed with prejudice. Thereafter, the trial court dismissed the intentional infliction of emotional distress claim, one count of breach of the DFR, and the prima facie tort claims upon the Union's motion for summary judgment. In response to the one remaining DFR count, the Union argued that punitive damages were unavailable as a matter of law for duty of fair representation suits. Following the denial of its motion for summary judgment, the Union filed a motion in limine to preclude punitive damages, which the district court also denied.

**{7}** The case against the Union proceeded to trial on the sole remaining claim that the Union breached its duty of fair representation by failing to file a grievance on Akins' behalf for racial discrimination. The jury was instructed, consistent with our holding in *Callahan v. N.M. Federation of Teachers-TVI*, 2006-NMSC-010, 139 N.M. 201, 131 P.3d 51, on the required elements of the claim of breach of DFR, as follows:

> To establish the claim of breach of the duty of the Union to fairly represent, [Akins] has the burden of proving each of the following contentions:
> 1. The existence of a contract, the Collective Bargaining Agreement, between the Union and the City of Carlsbad.
> 2. The breach of the terms of a Collective Bargaining Agreement by the City of Carlsbad.
> 3. [Akins] sought help from the Union to remedy the breach.
> 4. The Union failed or refused to provide [Akins] with representation related to the breach.
> 5. The Union's failure or refusal to pursue Jackie Akins' grievance was arbitrary and in bad faith.

The jury was also given the following standard New Mexico instruction on punitive damages:

> If you find that the conduct of the Union was malicious, willful, reckless, wanton, fraudulent or in bad faith, then you may award punitive damages against it. . . . Punitive damages are awarded for the limited purpose of punishment and to deter others from the commission of like offenses. The law does not require you to award punitive damages, however, if you decide to award punitive damages, you must use sound reason in setting the amount of the damages. The amount of punitive damages must be based on reason and justice taking into account all the circumstances, including the nature of the wrong and such aggravating and mitigating circumstances as may be

3

shown. The amount of an award of punitive damages must not reflect bias, prejudice, or sympathy toward any party. The amount awarded, if any, must be reasonable and not disproportionate to the circumstances.

UJI 13-1827 NMRA.

**{8}** The jury returned a verdict in Akins' favor, awarding him $1,661 in actual damages and $30,000 in punitive damages. Both Akins and the Union appealed. Akins appealed the trial court's decision not to put the intentional infliction of emotional distress claim before the jury. The Union appealed three issues: whether the trial court erred in (1) applying a four-year rather than six-month statute of limitations, (2) allowing the jury to consider punitive damages, and (3) failing to order remittitur of the punitive damages award.

**{9}** The Court of Appeals affirmed the trial court's rulings in their entirety. Regarding the issue of punitive damages, the Court of Appeals rejected the Union's request to adopt a per se ban on punitive damages in breach of DFR actions. *Akins v. United Steel Workers of Am. Local 187*, 2009-NMCA-051, ¶¶ 19-20, 146 N.M. 237, 208 P.3d 457. The Court followed by holding that the punitive damages award in this case was not excessive, and affirmed the trial court's decision not to order a remittitur. *Id.* ¶¶ 29-38.

**{10}** In its briefing to this Court the Union disputes several facts, but it does not raise any concrete legal argument against the jury's finding of liability. As such, this Opinion will focus exclusively on the sole question on certiorari: whether to adopt a per se ban on punitive damages in breach of DFR suits filed against labor unions, as a matter of state common law. This is a legal question which we review de novo.

**DISCUSSION**

***Foust* is not controlling.**

**{11}** As the exclusive representative of City employees under a collective bargaining agreement, the Union is responsible for prosecuting grievances on behalf of City employees. In New Mexico all unions owe a common-law duty of fair representation to their members, but are given considerable discretion to decide whether and how to pursue a member's grievance, consistent with the best interests of the Union membership as a whole. *See Callahan*, 2006-NMSC-010, ¶¶ 9, 13. In *Callahan*, we limited the common-law cause of action for breach of the DFR to arbitrary, fraudulent or bad faith conduct on the part of the union; allegations of mere negligence by the union do not state a viable claim for relief. *Id.* ¶¶ 10, 11.

**{12}** To explain the policy justification for our ruling in *Callahan*, we cited the U.S. Supreme Court opinion of *Vaca v. Sipes*, 386 U.S. 171 (1967), for its discussion of why the proper balance of interests in the collective bargaining arrangement requires limiting union members' access to the courts for DFR suits. *Callahan*, 2006-NMSC-010, ¶ 11. In following

4

the liability standard for DFR actions set forth in *Vaca*, we observed that "requiring arbitrary, fraudulent or bad faith conduct to prove a breach of the duty of fair representation is consistent with U.S. Supreme Court precedent." *Callahan*, 2006-NMSC-010, ¶ 11. The Union interprets this statement, and our adoption of the same rationale for a standard of liability as *Vaca*, to mean that "*Callahan* mandates that state courts are to develop the state [DFR] consistent with United States Supreme Court precedent in general and with *Vaca* in particular." But we have never professed slavish adherence to federal case law in developing our state common-law jurisprudence.

**{13}** The U.S. Supreme Court relied upon *Vaca*'s holding in its subsequent opinion in *International Brotherhood of Electrical Workers v. Foust*, 442 U.S. 42 (1979). Extending *Vaca*'s rationale, the Supreme Court in *Foust* adopted a per se ban on punitive damages in federal breach of DFR actions. *Foust*, 442 U.S. at 49-50. Before this Court, the bulk of the Union's case rests on the proposition that, since *Callahan* supposedly wedded the New Mexico DFR law to the federal common-law standard, *Foust*'s per se ban on punitive damages is automatically incorporated into the New Mexico common-law standard. This reasoning misconstrues our holding in *Callahan* and is inconsistent with our common-law authority.

**{14}** As a preliminary matter, we reject the Union's interpretation of our pronouncement in *Callahan*. We stated that "arbitrary, fraudulent or bad faith conduct" as a standard of liability in DFR actions "*is consistent with*" the standard of liability embraced by the U.S. Supreme Court in *Vaca*. *Callahan*, 2006-NMSC-010, ¶ 11 (emphasis added). We did not say, as the Union represents in its brief to this Court, that "the state duty . . . [is] *to be developed consistent with* such precedent." (Emphasis added.) The Union goes so far as to refer to "*the Callahan rule*" that New Mexico courts "are *obliged* to develop the state [DFR] consistent with United States Supreme Court precedent." (Emphasis added.) Emphatically, no such "rule" exists.

**{15}** In developing a body of state common law, we may look to federal law for guidance where it is persuasive and consistent with our state laws and policies. *See State v. Long*, 1996-NMCA-011, ¶ 7, 121 N.M. 333, 911 P.2d 227 (filed 1995). In *Callahan*, we relied on *Vaca* to fashion the appropriate standard of liability for DFR claims because its rationale was in line with New Mexico public policy. But just as we are free to embrace a federal common-law principle that comports with New Mexico's distinct needs and conditions, we are also free to reject one that is inconsistent with or hostile to our circumstances.

**{16}** The *Foust* majority, in denying punitive damages in federal DFR claims, explained that it was implementing a remedial scheme that would "best effectuate the purposes of the Railway Labor Act . . . to facilitate collective bargaining and to achieve industrial peace." 442 U.S. at 47. Specially concurring, Justice Blackmun pointed out that the *Foust* majority based its holding, in part, on the premise that the remedial federal labor policy is "inhospitable to punitive awards." *Id.* at 55 (Blackmun, J., concurring). In short, *Foust* was developing an area of interstitial federal common law to effectuate distinct congressional

5

goals set forth in federal statutes governing unions in the private sector. *Id*. at 47-48; *see also Woods v. Graphic Commc'ns*, 925 F.2d 1195, 1203 (9th Cir. 1991) ("The duty of fair representation is a judicially created duty arising out of the statutory grant of exclusive representation to unions under the Railway Labor Act and the National Labor Relations Act." (Citations omitted.)).

**{17}** In contrast, our state common law on DFR is clearly not tied to federal statutes regulating the private sector, nor to any one state statute pertaining to the public sector. The relationship between the Union and its City employee members is governed by the New Mexico Public Employee Bargaining Act (PEBA), but we have never held that the DFR cause of action is intended exclusively to effectuate the policy goals of that statute. *See Callahan*, 2006-NMSC-010, ¶¶ 24-25 (PEBA limited to providing administrative remedies; suit for breach of DFR operates outside mandates of PEBA). *But see Las Cruces Prof'l Fire Fighters v. City of Las Cruces*, 1997-NMCA-031, ¶¶ 14-15, 123 N.M. 239, 938 P.2d 1384 (holding that, generally, language of PEBA is to be interpreted in the same manner as identical National Labor Relations Act language). Certainly one purpose of the duty of fair representation is to facilitate the collective bargaining process and to protect union members' rights under collective bargaining agreements. *See Callahan*, 2006-NMSC-010, ¶¶ 9-10; *Jones v. Int'l Union of Operating Eng'rs*, 72 N.M. 322, 330, 383 P.2d 571, 576 (1963). More generally, however, the DFR cause of action is a common-law means of enforcing the fiduciary obligations of unions as the exclusive collective bargaining agents of their members. *See Jones*, 72 N.M. at 330, 383 P.2d at 576.

**{18}** We agree with Justice Blackmun's reasoning in *Foust* that a court enforcing a common-law duty "should have at its disposal the full panoply of tools traditionally used by courts to do justice between parties." 442 U.S. at 53 (Blackmun, J., concurring). Punitive damages are one such tool. We have no reason to dispute the U.S. Supreme Court's assessment of national needs under federal labor laws. Those concerns, while certainly relevant to our consideration, do not control the development of our common law. To the extent that our duty of fair representation shares a common purpose with the federal cause of action, we are free to weigh similar considerations differently. For the reasons set forth below, we hold that New Mexico's interest in enforcing a union's duty of fair representation counsels against adopting a per se ban on punitive damages.

**A per se ban on punitive damages is inconsistent with New Mexico public policy.**

**{19}** At the heart of today's controversy is the inherent tension that exists in most collective bargaining arrangements between the interests of individual union members and the well-being of the collective (the union as a whole). Our concern for the vitality of unions as collective bargaining agents is such that we elected in *Callahan* to raise the threshold for liability to shield merely negligent union conduct from suit by aggrieved members. Our decision in that case came at no small cost to the individual interests of union members, but we agreed that those interests must be subordinated to the collective interests of all members in a bargaining unit. *Callahan*, 2006-NMSC-010, ¶¶ 9-15. We concluded that the interests

of the collective are best served by a union that is able to exercise broad discretion in determining whether and how to prosecute an individual member's grievance. *Id*. To now go further and shield even the most egregious union conduct from punitive damages, would, in our view, undermine the interests of both Unions and their members.

**{20}** Punitive damages serve two important policy objectives under our state common law: to punish reprehensible conduct and to deter similar conduct in the future. *Bogle v. Summit Inv. Co.*, 2005-NMCA-024, ¶ 34, 137 N.M. 80, 107 P.3d 520. These objectives are of critical importance in the DFR context, where unions appropriately enjoy broad discretionary authority and the employee has little recourse outside of the grievance process. As our Court of Appeals observed, punitive damages are the best means of deterring union misconduct because actual or compensatory damages in DFR actions may be *de minimis* or difficult to quantify. *Akins*, 2009-NMCA-051, ¶ 24; *see also Sanchez v. Clayton,* 117 N.M. 761, 767, 877 P.2d 567, 573 (1994) ("Indeed, if the defendant's conduct otherwise warrants punitive liability, the need for punishment or deterrence may be increased by reason of the very fact that the defendant will have no liability for compensatory damages." (citing 1 Dan B. Dobbs, *Law of Remedies* § 3.11(10), at 515-16 (2d ed. 1993))). The present case is illustrative; a compensatory award against the Union of a mere $1,661 would hardly deter similar outrageous conduct against other Union members in the future.

**{21}** In *Foust*, the Supreme Court was persuaded that "windfall recoveries" against labor unions could "deplete union treasuries" and "impair[] the effectiveness of unions as collective-bargaining agents." 442 U.S. at 50-51. The Union argues that the same concerns merit adopting a per se ban on punitive damages for DFR actions in New Mexico. But nothing in the present case nor anything cited by the Union indicates that such fears are presently warranted in New Mexico's public sector. Despite *Foust*'s holding in the DFR context, unions in New Mexico are currently subject to punitive damages under a variety of federal laws, such as the Labor Management Reporting and Disclosure Act (LMRDA) and 42 U.S.C. § 1981 (2006). *See* 29 U.S.C. §§ 411(a)(4), 412 (2006) (right to sue and civil action/jurisdiction provisions of the LMRDA); *Int'l Bhd. of Boilermakers v. Braswell*, 388 F.2d 193, 200 (5th Cir. 1968) (punitive damages available under LMRDA); *Woods*, 925 F.2d at 1204 ("Under § 1981, the common law rule is that punitive damages may be awarded in appropriate cases."). Unions have also, up to now, been subject to punitive damages for breach of the state duty of fair representation. Thus, to adopt a per se ban here would be to *depart* from the status quo. Despite the potential for exposure to punitive damages from several angles, the Union cannot point to a single example where runaway punitive damages awards substantially debilitated a labor union in New Mexico. If anything, the present case suggests that our juries are entirely capable of assessing sensible and appropriate punitive damages.[2]

---

[2] The Union did not appeal the Court of Appeals' rejection of its claim that the punitive damages award in this case was excessive.

7

**{22}** Should a jury's punitive damages award exceed the bounds of reasonableness, several checks at the trial and appellate levels operate to temper jury exuberance. These checks include the trial court's ability to order a remittitur and the appellate courts' ability to review the award for reasonableness and constitutionality. *Chavarria v. Fleetwood Retail Corp.*, 2006-NMSC-046, ¶ 36, 140 N.M. 478, 143 P.3d 717; *see BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574-75 (1996).

**{23}** The present case illustrates the danger of further insulating unions in DFR actions. In response to serious allegations of a racially hostile work environment, the Union's response to Akins was that he was the wrong color and needed to learn to speak Spanish. At oral argument counsel for the Union asserted that such racial discrimination is the rarest type of DFR case. Counsel went on to describe an example of the "typical" DFR case as one where the Union fails to pursue an employee's grievance because the employee has shown favor to the employer, or is a "dissident" in the Union's eyes. This is the conduct that the Union would have us protect for the sake of hypothetical risks to the well-being of the collective. When we asked what safeguard would remain for the individual "dissident" were we to adopt a per se ban on punitive damages, counsel suggested that the Union's internal democratic process would be sufficient. We commend the Union for its forthright representation to this Court, but given the facts of this case, we remain persuaded of the need for the punishment and deterrence functions served by punitive damages awards.

**{24}** New Mexico law reflects a preference for holding individuals and institutions accountable for their actions regardless of status. *See Yount v. Johnson*, 1996-NMCA-046, ¶ 4, 121 N.M. 585, 915 P.2d 341 ("[O]ur courts have moved forcefully towards a public policy that defines duty under a universal standard of ordinary care, a standard which holds all citizens accountable for the reasonableness of their actions. The movement has been away from judicially declared immunity or protectionism, whether of a special class, group or activity."). For instance, like most other states, our Legislature has not adopted the doctrine of charitable immunity from suit in tort, despite policy arguments in favor of such immunity that are at least as persuasive as those in favor of immunity for unions. *See* Janet Fairchild, Annotation, *Tort Immunity of Nongovernmental Charities—Modern Status*, 25 A.L.R.4th 517 (Westlaw 2009) (citing cases completely or partially abrogating doctrine of charitable immunity in a majority of jurisdictions). *But see Abramson v. Reiss*, 638 A.2d 743, 750 (Md. 1994) (recognizing complete charitable immunity in Maryland); N.J. Stat. Ann. § 2A:53A-7 (West, Westlaw through L.2010, c.18) (codifying charitable immunity in New Jersey, except for "damages by a willful, wanton or grossly negligent act of commission or omission, including sexual assault and other crimes of a sexual nature"). Nor are we aware of any common-law cause of action in New Mexico for which punitive damages have been prohibited.

**{25}** In isolated circumstances, our Legislature has created limited tort immunity for certain actors and institutions. *See* NMSA 1978, §§ 24-15-1 to -14 (1969, as amended through 1997) (Ski Safety Act); NMSA 1978, §§ 41-4-1 to -29 (1976, as amended through 2009) (Tort Claims Act); NMSA 1978, §§ 41-10-1 to -5 (1981, as amended through 1997)

8

(Food Donors Liability Act); NMSA 1978, §§ 41-12-1 to -2 (1989, as enacted through 1997) (Athletic Organization Volunteers); NMSA 1978, §§ 42-13-1 to -5 (1993, as amended through 1995) (Equine Liability Act). With the exception of the Tort Claims Act, however, none of these statutes immunize conduct that would warrant a punitive damages award. The above statutes also suggest that the Legislature is capable of making exceptions to general tort principles when public policy so counsels. We would defer to the Legislature for such a drastic departure from current policy—if at all desirable—as that urged by the Union. *See Berlangieri v. Running Elk Corp.*, 2003-NMSC-024, ¶ 15, 134 N.M. 341, 76 P.3d 1098 ("Courts are generally less well-equipped to address complex policy issues than legislatures."); *Torres v. State*, 119 N.M. 609, 612, 894 P.2d 386, 389 (1995) ("[I]t is the particular domain of the legislature, as the voice of the people, to make public policy.").

**{26}** Finally, the Union argues that we should adopt a per se ban on punitive damages in DFR actions because punitive damages are not available under the Human Rights Act, and we should seek symmetry in the remedies the law provides for like conduct. *See* NMSA 1978, §§ 28-1-1 to -15 (1969, as amended through 2007) (Human Rights Act) (prohibiting discriminatory conduct); *Trujillo v. N. Rio Arriba Elec. Coop.*, 2002-NMSC-004, ¶ 30, 131 N.M. 607, 41 P.3d 333 (filed 2001) (punitive damages are not recoverable under New Mexico's Human Rights Act).

**{27}** We agree that symmetry of remedies is a laudable policy goal. The Union, however, conceded at oral argument that discriminatory conduct is rarely the basis for DFR actions. It makes little sense for us to align the common-law DFR remedial scheme with that of the statutory Human Rights Act. Moreover, the Human Rights Act was modeled after federal Title VII legislation, which has since been amended to *allow* for recovery of punitive damages. *See Ocana v. Am. Furniture Co.*, 2004-NMSC-018, ¶ 23, 135 N.M. 539, 91 P.3d 58 (New Mexico Human Rights Act tracks language of federal Title VII); 42 U.S.C. § 1981(a) (as amended by Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071) (allowing for recovery of punitive damages). More to the point, labor unions may be subject to liability under Title VII "for intentionally failing to file grievances concerning a racially hostile working environment." *Woods*, 925 F.2d at 1200. Thus, the exact conduct exhibited by the Union in this case could subject the Union to punitive damages in a federal Title VII case.

**{28}** As we mentioned above, we are aware of no New Mexico common-law cause of action in tort where we have held that punitive damages are unavailable as a matter of law. Absent a more compelling policy consideration than that presented by the Union, we make no exception for DFR claims.[3] Accordingly, we adhere instead to the general common-law

---

[3] We also note that several other states allow punitive damages in suits against unions for breach of the duty of fair representation. *See, e.g.*, *Norton v. Adair County*, 441 N.W.2d 347, 363-64 (Iowa 1989) (punitive damages are permissible in action against union for breach of duty of fair representation if actual or legal malice is demonstrated); *Brown v. Me.*

9

principle in New Mexico that punitive damages should be available as long as the wrongdoer's conduct is willful, wanton, malicious, reckless, fraudulent or in bad faith. *See* UJI 13-1827; *Coates v. Wal-Mart Stores, Inc.*, 1999-NMSC-013, ¶ 47, 127 N.M. 47, 976 P.2d 999.

**The fact that the liability and punitive damages DFR standards contain overlapping terms does not mean that punitive damages are automatically available in every DFR action.**

{29}    The Union argues that because the general standard for punitive damages (willful, wanton, malicious, reckless, oppressive, fraudulent or in bad faith) describes essentially the same conduct as the DFR standard for liability (arbitrary, fraudulent or bad faith), unions are unfairly subject to punitive damages in every case where a plaintiff establishes liability. The Union asserts that such "automatic" exposure to punitive damages in nearly every case skews the balance established by *Callahan* in favor of individual members, to the greater detriment of the collective. This issue, while not a significant focus of the Union's briefing, nonetheless warrants careful consideration, as it lies at the heart of our punitive damages jurisprudence.

{30}    We agree with the Union that the liability and punitive damages standards substantially overlap, but that is not a novel occurrence in our law. Breach of the duty of fair representation is but one of several causes of action where the standard for liability closely resembles the standard for punitive damages, UJI 13-1718, usually where liability is limited to proof of a heightened culpability. Examples include: (1) intentional infliction of emotional distress, *see* UJI 13-1628 NMRA; *Baldonado v. El Paso Natural Gas Co.*, 2008-NMCA-010, ¶ 28, 143 N.M. 297, 176 P.3d 286 (filed 2006), (2) fraudulent misrepresentation, *see* UJI 13-1633 NMRA; *Garcia v. Coffman*, 1997-NMCA-092, ¶ 38, 124 N.M. 12, 946 P.2d 216, and (3) insurance bad faith, *see* UJI 13-1704 NMRA; *Sloan v. State Farm Mut. Auto. Ins. Co.*, 2004-NMSC-004, ¶¶ 2, 18, 135 N.M. 106, 85 P.3d 230. Indeed, most intentional tort cases provide at least the potential for punitive damages, because intentional conduct is "willful." *See generally Sanchez*, 117 N.M. at 767, 877 P.2d at 573.

{31}    In *Sloan*, we were asked to decide whether a punitive damages instruction is required in every insurance bad faith case, or whether some culpable mental state beyond bad faith is required. 2004-NMSC-004, ¶ 1. We held that a stricter standard for punitive damages

---

*State Employees Ass'n*, 690 A.2d 956, 959 (Me. 1997) (statutory DFR grants executive branch agency broad authority to fashion remedy for breach). States that do not allow punitive damages in DFR suits, for the most part, are those that have tied their governing law to federal law in the manner the Union here urges. *See, e.g.*, *Demings v. City of Ecorse*, 377 N.W.2d 275, 277-78 (Mich. 1985); *Sw. Bell Tel. Co. v. Buie*, 689 S.W.2d 848, 852 (Mo. Ct. App. 1985).

was not required, stating

> we reaffirm our statement in *Jessen v. National Excess Insurance Co.*, 108
> N.M. 625, 627, 776 P.2d 1244, 1246 (1989) that "[b]ad faith supports
> punitive damages upon a finding of entitlement to compensatory damages."
> Accordingly, an instruction on punitive damages will ordinarily be given
> whenever the plaintiff's insurance-bad-faith claim is allowed to proceed to
> the jury. We do, however, somewhat limit the per se *Jessen* rule by affording
> the trial court the discretion to withhold a punitive-damages instruction in
> those rare instances in which the plaintiff has failed to advance any evidence
> tending to support an award of punitive damages.

*Id.* ¶ 6 (alteration in original).

**{32}** In *Sloan*, we modified the jury instruction, UJI 1718, to describe the specific conduct that warrants punitive damages, in insurance bad faith cases, only a small subset of the range of establishing liability. *Sloan*, 2004-NMSC-004, ¶ 17 ("[W]e acknowledge the [liability] instructions as written might be interpreted . . . as permitting merely unreasonable conduct to support a finding of bad faith sufficient for an award of punitive damages. . . . While the unreasonable conduct described in these instructions may support an award of compensatory damages, such conduct does not support an award of punitive damages."). Unlike the insurance bad faith context, however, the prima facie DFR case does not include any conduct that is necessarily outside the possible range of the punitive damages instruction—willful, wanton, malicious, reckless, oppressive, fraudulent or in bad faith. As a result, we need not draw a line between conduct that could support a punitive damages award and that which could not.

**{33}** Still, a punitive damages award is far from "automatic." The distinction between a finding of liability and an award of punitive damages lies not in the parsing of adjectives, but in the nature of the jury's inquiry, and the role of judge and counsel in guiding that inquiry. The jury must first engage in a factual inquiry to determine whether the plaintiff has proved the elements of the claim. If so, the jury must then engage in a much different inquiry—a moral determination—to decide whether the defendant's conduct should be punished, and whether such punishment would serve to deter similar conduct in the future. It is the role of the trial judge to explain the different duties to the jury, and the role of counsel to argue the elements and policy of liability and punitive damages separately.

**{34}** Here, the jury was given detailed instructions on liability, which explained that "Akins ha[d] the burden of proving" numerous contentions, including that "[t]he Union's failure or refusal to pursue [Akins'] grievance was arbitrary and in bad faith." Jury Instruction 12 explained that the amount of compensatory damages, if any, "must be based upon proof and not upon speculation, guess or conjecture." The trial court gave the jury a separate punitive damages instruction, which defined the conduct required to warrant punitive damages. But the instruction also explained that punitive damages are not *required*

11

by the law and are only awarded "for the limited purpose of punishment and to deter others from the commission off [sic] like offenses."

{35}    The separate jury instructions, along with the separate questions on the special verdict form, very clearly distinguished between the two inquiries required of the jury. The jury was not instructed to simply match conduct to terms; it was instructed to engage in one inquiry that focused on facts and proof and another that focused on punishment and deterrence. In both circumstances, it was necessary to match the Union's conduct to the terms of the respective standard, but that alone was not sufficient. For liability, the jury was expected to weigh proof of the element of lost earnings, calculate compensatory damages based on lost income alone, and disregard sympathy or prejudice. For punitive damages, the jury was instructed to consider the concept of justice and aggravating or mitigating circumstances and to disregard bias, prejudice, or sympathy. We are satisfied that, despite certain overlapping terms, the jury instructions left no room for confusion between the liability and punitive damages inquiries.

{36}    We emphasize that the parties also play an important role in guiding the jury to an appropriate award by litigating the issues that are specific to the punitive damages inquiry. The punitive damages instruction clearly charges that "[t]he amount of punitive damages must be based on reason and justice taking into account all the circumstances, including the nature and enormity of the wrong and such aggravating and mitigating circumstances as may be shown." UJI 13-1827. The Union argues on appeal that punitive damages are especially harmful to small, unsophisticated unions like itself, whose only income is derived from the modest dues of its limited membership. The Union also argues that the punitive damages award in this case is disproportionate to the Union's conduct as described at trial. These are precisely the sort of "mitigating circumstances" the jury instruction envisions, yet the Union failed to make these arguments, with supporting evidence, to the jury. Whatever the Union's trial strategy in this case, the punitive damages instruction leaves ample room for the parties to argue liability and punitive damages separately, and to ensure that juries do not confuse the two.

**CONCLUSION**

{37}    We affirm the ruling of the Court of Appeals and the judgment of the district court.

{38}    **IT IS SO ORDERED.**

_____
                                    **RICHARD C. BOSSON, Justice**


**WE CONCUR:**

_____
**CHARLES W. DANIELS, Chief Justice**

12

_____

**PATRICIO M. SERNA, Justice**


_____

**PETRA JIMENEZ MAES, Justice**


_____

**EDWARD L. CHÁVEZ, Justice**


**Topic Index for** _Akins v. United Steelworkers of America, AFL-CIO, CLC, Local 187_
**Docket No. 31,637**

| **AY** | **AGENCY** |
| AY-FD | Fiduciary Duty |

| **AE** | **APPEAL AND ERROR** |

| **AS** | **ASSOCIATIONS AND SOCIETIES** |
| AS-CO | Charitable Organizations |
| AS-NC | Non-Profit Corporations |

| **CP** | **CIVIL PROCEDURE** |
| CP-AU | Actions and Defenses |
| CP-BF | Bad Faith |
| CP-CS | Causes of Action |
| CP-JV | Jury Verdict |
| CP-PF | Prima Facie Case |
| CP-RM | Remittitur |
| CP-VD | Verdict |

| **CR** | **CIVIL RIGHTS** |
| CR-ED | Employment Discrimination |
| CR-HA | Human Rights Act |
| CR-RD | Racial Discrimination |

| **EL** | **EMPLOYMENT LAW** |
| EL-CB | Collective Bargaining |
| EL-DS | Discrimination |
| EL-GR | Employee Grievances |
| EL-UO | Union Organizing |
| EL-LU | Labor Unions |

| **IN** | **INSURANCE** |

13

| | |
|---|---|
| IN-BF | Bad Faith |
| **JR** | **JURIES** |
| JR-JG | Juries, General |
| **JI** | **JURY INSTRUCTIONS** |
| JI-CI | Civil Jury Instructions |
| JI-JI | Jury Instructions, General |
| **LL** | **LABOR LAW**<br>See: EMPLOYMENT LAW |
| **RE** | **REMEDIES** |
| RE-AR | Additur and Remittitur |
| RE-CD | Compensatory Damages |
| RE-EP | Exemptions |
| RE-MD | Measure of Damages |
| RE-PD | Proof of Damages |
| RE-PU | Punitive Damages |