This memorandum opinion was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**MATIAS MAESTAS and JOAN MAESTAS,**

    Plaintiffs-Appellees/Cross-Appellants,

v.                                           **NO. 29,819**

**ANTONIO MEDINA, IVAN ROPER, RICHARD OLIVAS, JOHN BONEY, DAVID MONDRAGON, ESTATE OF MAXIMO MONDRAGON, ACEQUIA del CAÑONCITO COMMUNITY DITCH ASSOCIATION, and ACEQUIA del ENCINAL COMMUNITY DITCH ASSOCIATION,**

    Defendants-Appellants/Cross-Appellees.

**APPEAL FROM THE DISTRICT COURT OF MORA COUNTY**
**Eugenio S. Mathis, District Judge**

Maestas & Suggett, P.C.
Paul Maestas
Albuquerque, NM

for Appellees/Cross-Appellants

Peter Thomas White
Santa Fe, NM

for Appellants/Cross-Appellees

**MEMORANDUM OPINION**

**VANZI, Judge.**

This case requires us to consider whether ditch association members and commissioners are immune from suit under the Tort Claims Act (TCA), NMSA 1978, Sections 41-4-1 to -27 (1976, as amended through 2009), specifically through Section 41-4-13, which excludes ditch associations from many of the waivers of immunity enumerated in the TCA. Concluding that the Legislature did not intend to exclude ditch association members and commissioners from the waivers of immunity, we consider whether there was substantial evidence in the record from which the district court could have found that the ditch association members and commissioners were trespassing on the property of Plaintiffs and whether the damages awarded were reasonable. We affirm, as there is substantial evidence to support the district court's findings.

**BACKGROUND**

In 1960, Plaintiff Matias Maestas purchased property located near Holman, New Mexico, in Mora County. He owns the property with his wife, Plaintiff Joan Maestas. Plaintiffs' property is located directly south of property belonging to the

Sims family. On the Sims' land, which is also located in Mora County, there is a spring, which is generally referred to as an ojito, and the ojito connects to an irrigation ditch, which is commonly called an acequia. The ojito and acequia on the Sims' property is used by the members of two local ditch associations, La Acequia del Cañoncito Association (Cañoncito) and La Acequia del Encinal Association (Encinal), to irrigate approximately 408 acres on association members' properties.

Forty-three years after Plaintiffs purchased the land, some commissioners and a member from the two ditch associations gathered as a joint commission of Encinal and Cañoncito ditch associations. At that meeting, the commissioners decided that they needed to work on their access routes to the common acequias so that they would not lose the right to use the routes.

On October 11, 2003, ditch association members and commissioners from the Cañoncito and Encinal ditch associations (Defendants) entered an area of Plaintiffs' property that they believed was an historical path known as both the National Forest Path and La Vereda Nacional. They believed that they had an historical right to use the National Forest Path, as it was their access route to the acequia and ojito on the Sims' property. They began clearing the area that they thought was the National Forest Path so they could get a backhoe to the acequia and ojito for repair work. To clear the land, the association members and commissioners cut trees, shrubs, and used

3

a Bobcat tractor to scrape the dirt on a part of the property to level it for a road. They also loaded a small red pickup truck with the cut wood so they could remove it from the property.

Neighbors noticed that Defendants were on Plaintiffs' property and called Plaintiff Joan Maestas and her daughter, Lori Maestas Barela, to alert them to what Defendants were doing. After several hours and a confrontation between Joan, Lori, and Defendants about Defendants' right to be on the property, Defendants removed the cut trees from their pickup truck and stopped their work on Plaintiffs' property.

On October 17, 2003, Plaintiffs filed a complaint for trespass and other actions. Defendants filed a motion to dismiss the complaint on the ground that they were immune from suit under the TCA, but the district court denied the motion. The case proceeded to a bench trial on trespass and other claims. The district court found that Defendants were not acting in the scope of their duties as ditch commissioners and that they had trespassed on Plaintiffs' property, and it awarded Plaintiffs approximately $29,000 in damages.

Defendants appeal on a number of grounds, specifically (1) that the district court erred in ruling that the ditch commissioners were not immune from liability under the TCA, (2) that the district court erred in ruling that Plaintiffs had title to land known as the National Forest Path, (3) that the district court erred in finding that

Defendants trespassed on Plaintiffs' land because Plaintiffs did not have actual or constructive possession of the National Forest Path, (4) that the district court erred in finding that the ditch associations did not have an easement to use the National Forest Path, and (5) that the district court erred in awarding Plaintiffs compensatory and punitive damages. Plaintiffs filed a cross-appeal contending (1) that the district court's award of punitive damages was unconstitutional because it was too low, and (2) that the district court abused its discretion in denying their request for attorney fees. We address each of the arguments in turn.

**DISCUSSION**

**Defendants Were Not Immune From Suit Under the TCA**

Defendants first contend that the district court erred in concluding that they were not immune from liability under the TCA. We review de novo the question of whether the TCA bars a tort claim against a public entity, as it presents a question of statutory interpretation, which is a question of law. *Rutherford v. Chaves Cnty.*, 2003-NMSC-010, ¶ 8, 133 N.M. 756, 69 P.3d 1199.

The ultimate purpose of statutory interpretation is to give effect to the intent of the Legislature. *Jolley v. Associated Elec. & Gas Ins. Servs. Ltd.*, 2010-NMSC-029, ¶ 8, 148 N.M. 436, 237 P.3d 738. To do so, we first consider the plain language of the statutes. *Vescio v. Wolf*, 2009-NMCA-129, ¶ 13, 147 N.M. 374, 223 P.3d 371.

We will not depart from the plain language of a statute "unless we must resolve an ambiguity, correct a mistake or absurdity, or deal with a conflict between different statutory provisions." *Id.* (internal quotation marks and citation omitted). "Statutory provisions purporting to waive governmental immunity are strictly construed." *Rutherford*, 2003-NMSC-010, ¶ 11.

Under the TCA, the Legislature has granted immunity from tort liability to any "governmental entity and any public employee while acting within the scope of duty . . . except as waived by . . . Sections 41-4-5 through 41-4-12." Section 41-4-4(A) ("Granting immunity from tort liability; authorizing exceptions."). Sections 41-4-5 through -12 set forth provisions waiving immunity for "damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties" in a number of different situations. *See, e.g*, § 41-4-5 (waiving immunity for damages from situations where a public employee acting in the scope of his duties is negligent in the operation or maintenance of any motor vehicle, aircraft, or watercraft); § 41-4-7 (waiving immunity for situations arising out of the negligence of public employees acting in the scope of their duties in the operation of airports); § 41-4-9 (waiving immunity for damages arising from the negligence of a public employee acting in the scope of their

6

duties in the "operation of any hospital, infirmary, mental institution, clinic, dispensary, medical care home or like facilities").

These waivers are not absolute. Under Section 41-4-13, the Legislature enacted an exclusion from many of the waivers of immunity for community ditches, acequias, and other associations created pursuant to the Sanitary Projects Act. Although the statute now expressly applies to both a ditch association and its public employees, in 2003, that exclusion read:

> All community ditches or acequias and all associations created pursuant to the Sanitary Projects Act are hereby excluded from the waiver of immunity of liability under Sections 41-4-6 through 41-4-12.

NMSA 1978, § 41-4-13 (1977). The plain language of the exclusion does not reference public employees. Thus, the plain language suggests that the Legislature intended that public employees not be excluded from the waivers of immunity in the TCA or, in simpler terms, that public employees are still subject to liability for the conduct described in Sections 41-4-5 through -12.

This interpretation is strengthened by the Legislature's use of the term "public employee" throughout the TCA. *See, e.g.*, § 41-4-4(A) ("A governmental entity and any public employee while acting within the scope of duty are granted immunity from liability."); § 41-4-6(A) ("The immunity granted pursuant to Subsection A of Section 41-4-4 . . . does not apply to liability for damage resulting from . . . the negligence of

7

public employees[.]"); § 41-4-7(A) (same); § 41-4-8(A) (same). Thus, where the Legislature did not use a term that it had used in other Sections, we conclude that it did not intend for public employees to be covered by the exclusion of immunity.

Defendants cite to the 2006 amendment to Section 41-4-13 as evidence of the legislative intent to exclude public employees from the waivers in Sections 41-4-5 to -12. However, the amendment can be used as evidence to support either interpretation, and therefore, is not persuasive. Rather, we rely on the plain language interpretation of the exclusion. The plain language of the exclusion as it read on the date of the offense, construed together with the other portions of the TCA, is sufficiently clear that the Legislature, at the time of the enactment of the exclusion, did not intend to exclude ditch association members and commissioners from the waivers of immunity in the TCA. *See High Ridge Hinkle Joint Venture v. City of Albuquerque*, 1998-NMSC-050, ¶ 5, 126 N.M. 413, 970 P.2d 599 (explaining that the plain language of the statute is the primary indicator of legislative intent and that when several sections of a statute are involved, they must be read together so that all parts are given effect).

We also acknowledge that the under our interpretation of the TCA, the ditch associations would still provide a defense for the public employees who were acting in the scope of their duties, if an insurance carrier did not, and would also be required

8

to pay any settlement or final judgment entered against a public employee. *See* § 41-4-4(B) ("Unless an insurance carrier provides a defense, a governmental entity shall provide a defense, including costs and attorney fees, for any public employee when liability is sought for . . . any tort" or for "any violation of property rights or any rights, privileges or immunities secured by the constitution and laws of the United States" or the state of New Mexico.); § 41-4-4(D) ("A governmental entity shall pay any settlement or any final judgment entered against a public employee for . . . any tort."). But considering these payment provisions with our interpretation of the waiver does not create an absurd result, as the Legislature also contemplated and provided for indemnification by public employees when that employee acted fraudulently or with intentional malice while acting in the scope of his duties. *See* § 41-4-4(E) ("A governmental entity shall have the right to recover from a public employee the amount expended by the public entity to provide a defense and pay a settlement agreed to by the public employee or to pay a final judgment if it is shown that, while acting within the scope of his duty, the public employee acted fraudulently or with actual intentional malice causing the bodily injury, wrongful death or property damage resulting in the settlement or final judgment.").

We do not consider Defendants' argument that the district court erred in concluding that they were not acting in the scope of their duties, as they argued we

9

should only reach such argument if we decide to extend the exclusion to provide them with immunity. We also note that Defendants have not argued that the claims against them should have been limited to those for which the TCA waives immunity in Sections 41-4-5 to -12. Therefore, we do not consider whether trespass was a proper cause of action.

**There Is Substantial Evidence to Support the District Court's Finding That Defendants Caused Damage to Plaintiffs' Land That Was Not the National Forest Path**

Defendants contest the district court's findings that they trespassed on Plaintiffs' land. "We review the district court's factual findings for substantial evidence." *Davis v. Devon Energy Corp.*, 2009-NMSC-048, ¶ 13, 147 N.M. 157, 218 P.3d 75.

Most of Defendants' arguments are framed such that they assert error in the district court's findings about the National Forest Path. Defendants specifically argue that the district court should not have determined that Plaintiffs had title to the National Forest Path, that Plaintiffs were in possession of the National Forest Path, and that Defendants did not have an easement to use the National Forest Path. However, we note that the district court's findings that support the trespass do not actually reference the National Forest Path. Instead those findings state:

1.      Plaintiffs own the property at issue in this lawsuit;

. . . .

8. On October 11, 2003, . . . Defendants appeared on Plaintiffs' property and moved dirt, cleared trees, cut down trees and cut shrubbery to clear a path through Plaintiffs' property that they intended to utilize to access the ojito;

. . . .

14. The area over which . . . Defendants cut a road on October 11, 2003, and over which the Ditch Associations claim a right of access, was owned by . . . Plaintiffs on October 11, 2003.

We consider whether there was substantial evidence to support the district court's findings that Defendants trespassed on Plaintiffs' property. We conclude that there was substantial evidence presented that Defendants were both on and off of the path within the boundaries of Plaintiffs' property and that the evidence that they were off the path was sufficient to support a claim for trespass, even if Defendants had a right to use the National Forest Path.

First, there is substantial evidence in the record to support a finding that Defendants were within the boundaries of Plaintiffs' property. Although the parties disputed the location of the northern boundary of Plaintiffs' property, there is substantial evidence that Defendants were on land that belonged to Plaintiffs. Leroy Smith, Plaintiffs' expert surveyor, testified that he found the northern boundary of Plaintiffs' property and indicated such on his survey, Exhibit S, with a dark black line. He also testified that he had seen the stumps of the trees and the area where

11

Defendants had started cutting a road and that the area was within the boundaries of Plaintiffs' property. Garland Burnett, Defendants' expert surveyor, testified that Smith may have erred in locating the northern boundary of Plaintiffs' property. He indicated that instead of the black boundary line on Exhibit S, which is also represented by a green line on Exhibit 47, he thought Plaintiffs' boundary was the red line on Exhibit 47, which is located to the south of the green line. But he also testified that he did not have as much information as he would have liked to accurately or comfortably be able to fix the northern boundary line on Plaintiffs' property. Based on Smith's testimony, the district court's finding that the northern boundary line was the black line indicated on Exhibit S is supported by substantial evidence. *See Buckingham v. Ryan*, 1998-NMCA-012, ¶ 10, 124 N.M. 498, 953 P.2d 33 ("[W]hen there is a conflict in the testimony, we defer to the trier of fact.").

Second, there is substantial evidence to support the district court's finding that Defendants caused damage to Plaintiffs' land that was not a part of the National Forest Path. Plaintiff Matias Maestas testified that Defendants damaged land that was not the area of his property that may have once been the National Forest Path. He indicated the location of the damage by highlighting that area on Exhibit S, a final survey plat displaying the boundaries and other physical landmarks of the property, with a pink marker. That highlighted pink line is to the south of the black boundary

12

line, which indicates the northern boundary of Plaintiffs' property as established by Smith. Plaintiff Matias Maestas testified that Defendants cut a road in an area where there had never been a road before on his property. He also explained that there were no trees cut between the brass cap to the metal gate that leads to the Sims' property, but that all the trees that were cut were west of the metal gate located on the far west end where there was a thicket of trees.

Plaintiffs' expert surveyor, Smith, also testified that Defendants damaged a part of the land that was not the National Forest Path. He testified that there was no evidence that the road that he identified as a trail on Exhibit S had been used in at least twenty years. He also expressed that there was no evidence of a trail or a road along the northern boundary of Plaintiffs' property to the west of the metal gate or along the pink line that was drawn by Plaintiff Matias Maestas at trial on Exhibit S below the northern boundary line of Plaintiffs' property.

Defendants own expert could not state that Defendants never ventured off of the National Forest Path. Defendants' expert surveyor, Burnett, testified on cross-examination that he only inspected the property after October 11, 2003. He stated that there were indications of a path or road from the Plaintiffs' gate going west, but he did not go as far west as necessary to inspect the area where Plaintiffs claimed Defendants cut trees and a road on their property. He also stated that he walked over a portion of

the land with a road or path on it that was quite old, but he did not see any evidence of recent clearing on that portion of Plaintiffs' land that he walked on. Finally, he stated that he did not see the trees that had been cut down and that he was not taken to an area where there were stumps of trees or any indication that trees had been cut down by Defendants.

Indulging all reasonable inferences in favor of the district court's decision, we conclude that the above testimony constituted substantial evidence in support of the district court's findings that Defendants trespassed upon and damaged part of the Plaintiffs' property that was not the National Forest Path. *See Las Cruces Prof'l Fire Fighters v. City of Las Cruces*, 1997-NMCA-044, ¶ 12, 123 N.M. 329, 940 P.2d 177 ("[W]e will not reweigh the evidence nor substitute our judgment for that of the fact finder."). Accordingly, there is substantial evidence in the record to support the district court's finding that Defendants trespassed on Plaintiffs' property when they cut trees and a road on Plaintiffs' land in October 2003.

Because we have concluded that there was sufficient evidence to support a finding that Defendants were off of the National Forest Path, we need not address Defendants' arguments relating to the path. We need not consider Defendants' argument about whether the district court had jurisdiction to determine if Plaintiffs had title to the National Forest Path or whether it was error for the district court to

determine that Plaintiffs were in possession of the land designated as the National Forest Path. We also do not consider whether the district court erred in concluding that Defendants did not have an easement over the National Forest Path, as such arguments have no bearing on our review of the district court's findings that Defendants cut a road without permission through a portion of land owned by Plaintiffs that was located to the west of the area that was once purportedly the National Forest Path.

**The District Court Did Not Err in Its Award of Compensatory Damages**

Defendants contend that the district court erred in awarding compensatory damages to Plaintiffs because Plaintiffs did not prove their damages with "reasonable certainty." We will affirm the district court's award of compensatory damages if it is supported by substantial evidence. *See Chavarria v. Fleetwood Retail Corp.*, 2006-NMSC-046, ¶ 17, 140 N.M. 478, 143 P.3d 717 (upholding an award for compensatory damages where there was substantial evidence supporting it).

In New Mexico, it is the burden of the party seeking to recover damages to prove "the existence of injuries and resulting damage with reasonable certainty." *Abbinett v. Fox*, 103 N.M. 80, 86, 703 P.2d 177, 183 (Ct. App. 1985). "However, the theory of damages is founded on the principle of making the injured party whole. In

15

computing damages the fact finder is not held to an inflexible or precise standard; the object is to afford just and reasonable compensation for the injuries sustained." *Id.*

Here, we affirm the award of compensatory damages because there is substantial evidence in the record from which the district court could have found that Plaintiffs met their burden with reasonable certainty. Plaintiff Matias Maestas testified that 185 trees were cut from his property. He stated that among those trees, there were a few that were 200-year-old Gambel Oaks, and the remainder were smaller trees ranging in size from approximately three inches in diameter to about a foot in diameter. He also testified that he met with Dan Cassidy from the Cassidy Tree Farm and Landscaping business to compute an estimate of the cost of replacing the trees that were cut. Plaintiff Matias Maestas stated that from the numbers he obtained from Cassidy, he calculated the value of replacing 150 trees with four-inch diameters, for approximately $40 per tree, as $6000. He also calculated the cost of replacing thirty trees with three-inch diameters at a price of approximately $33 per tree as totaling $990. He stated that the total cost to replace the five large trees with approximately fourteen-inch diameters was $1000 because each tree would cost around $200. Finally, there was testimony that it would cost $200 per cord to replace four cords of oak and that there were shrubs that were also cut that would need to be

replaced. Thus, he testified that it would cost approximately $9000 to replace the trees, wood, and shrubs that were damaged by Defendants.

There was also testimony concerning the value of the land that Defendants were scraping with the Bobcat. Plaintiff Matias Maestas testified that the whole area where Defendants were cutting was in the range of 1200 feet. Smith testified that a section of land approximately 1300 feet long by 12 feet wide was equal to around 0.372 acres of land. Plaintiff Matias Maestas testified that he had previously sold some land for about $3000 an acre, but that at the time of the trial he would have sold the land for around $5000 an acre. *See City of Albuquerque v. Ackerman*, 82 N.M. 360, 362, 482 P.2d 63, 65 (1971) ("An owner of real property is presumed to have special knowledge as to its value by reason of ownership and is therefor[e] competent to testify to value."). Thus, there was substantial evidence from which the district court could have concluded that the section of ground that was damaged was worth close to $3000.

We conclude that the testimony presented by Plaintiffs on the issue of damages is sufficient to support the district court's calculation that the damages equaled around $11,580. *See Ledbetter v. Webb*, 103 N.M. 597, 604, 711 P.2d 874, 881 (1985) ("Precise mathematical computation is not required."). We affirm the district court's award of $23,160 compensatory damages, as trespassers are statutorily liable to

17

property owners for an amount double the appraised value of damages to their property. *See* NMSA 1978, § 30-14-1.1(D) (1983) (providing that persons who enter the property of another without permission and cause some damage to the property "shall be liable to the owner, lessee or person in lawful possession for damages in an amount equal to double the amount of the appraised value of the damage of the property injured or destroyed"). We note that the statute provides for double the "appraised value" of the damage to the property. The district court doubled the value of damage that Plaintiff Matias Maestas testified he suffered. We do not decide whether his testimony qualified as an "appraised value" under the statute because Defendants do not argue that "value" is distinguishable from "appraised value."

On appeal, Defendants reason that Plaintiffs' calculations were speculative and that they should have only received nominal damages because the damages would have only been nominal if Plaintiffs had mitigated. First, we note that Defendants did not object to Plaintiff Matias Maestas calculations at trial as speculative or unreliable. *See Attorney Gen. of N.M. v. N.M. Pub. Serv. Comm'n*, 101 N.M. 549, 552-53, 685 P.2d 957, 960-61 (1984) (stating that "[i]f a proper objection is not made, the evidence may be considered in the same manner as any other relevant evidence and has sufficient probative value to support a finding. . . . Failure to object to the admission of evidence operates as a waiver" (citation omitted)). Although defense counsel

elicited some testimony from Plaintiff Matias Maestas concerning firewood and suggested one finding of fact that stated "the extent of damages, if mitigated, was not substantial and only nominal[,]" he did not specifically argue to the district court that Plaintiffs should have mitigated their damages by selling the cut trees as firewood or that the property was valuable as grazing land for cattle, nor did he introduce evidence that such actions would have been feasible or successful. Thus, the district court did not have an opportunity to rule on such arguments, and the district court did not err in failing to conclude on its own that Plaintiff Matias Maestas needed to mitigate his damages by selling the cut trees as firewood or by using the cleared land to graze cattle.

**The Punitive Damages Awarded Did Not Deny Either Plaintiffs or Defendants Due Process of Law as Guaranteed by the Fourteenth Amendment**

Both Defendants and Plaintiffs contend that the district court erred in awarding $1000 in punitive damages against each of the six Defendants, for a total of $6000. Defendants argue that there was no evidence that their actions in trespassing on and damaging Plaintiffs' property were intentional or willful, reckless, or wanton so as to warrant punitive damages. In their cross-appeal, Plaintiffs argue that the award was disproportionately low when compared to the compensatory damages award and that the low award violated their due process and equal protection rights. We review the reasonableness of the district court's award of punitive damages de novo because we

19

make an independent assessment of the record in order to determine whether the fact finder's award of punitive damages is comparatively reasonable. *Aken v. Plains Elec. Generation & Transmission Coop., Inc.*, 2002-NMSC-021, ¶ 19, 132 N.M. 401, 49 P.3d 662

Both parties cite to the test from *Aken* as the proper framework with which to analyze these arguments. *Id.* ¶¶ 20-27. The *Aken* framework was adopted by the New Mexico Supreme Court from the United States Supreme Court case, *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996). *See Aken*, 2002-NMSC-021, ¶¶ 20-21. The factors were developed to evaluate punitive damages to determine if the award was disproportionately high, such that the award violated the defendant's due process and equal protection rights. *Id.* ¶¶ 8, 11-12, 19-20 (using the *BMW* test to review a punitive damages award to determine if it was "grossly excessive" and in violation of a defendants substantive due process rights). We will consider the *Aken* factors and the reasonableness of the award to consider Defendants' contention that the punitive damages award was unreasonably high.

In our review, we consider the following three factors: "(1) the reprehensibility of the defendant's conduct, or the enormity and nature of the wrong; (2) the relationship between the harm suffered and the punitive damages award; and (3) the

20

difference between the punitive damages award and the civil and criminal penalties authorized or imposed in comparable cases." *Chavarria*, 2006-NMSC-046, ¶ 36.

Of the *Aken* criteria, the first—the reprehensibility of a defendant's conduct—is "the most important idicum of the reasonableness of a punitive damages award." *Chavarria*, 2006-NMSC-046, ¶ 37 (alteration, internal quotation marks, and citation omitted). Several Defendants testified that they thought they had a right of access across Plaintiffs' land to get to the ojito and acequia so that they could make repairs and also to determine if people in the area were illegally diverting water from their acequia. They testified that they had previously used other areas of land to reach the ojito and acequia, but they had lost access to those areas and, therefore, needed to use the National Forest Path again in order to get a backhoe to their ojito.

However, there is also evidence in the record that Plaintiffs did not give Defendants permission to be on the land; that Defendants did not attempt to determine if they had a right of access across Plaintiffs' property because Defendants believed they had one that was established by historical custom; and that Defendants did not inquire as to where that access might have been located in connection to Plaintiffs' land. Although Defendants testified that they did not request permission from the Sims to use their property because they believed they no longer could use the Sims' road to the ojito and acequia, there was evidence that the Sims would have been

accommodating and that the access through the Sims' property would have been easier for them to use.

Furthermore, Defendants never checked any surveys or other documents or made any efforts to determine if they had a right to demolish Plaintiffs' property to create a road to get a backhoe to their acequia. Instead, they just destroyed an area to the west of what may have been the National Forest Path. Additionally, even after Joan Maestas confronted Defendants and told them to leave her property, they remained on the land and continued destroying trees and interfering with the natural vegetation and grade of the land for several hours. The demolition continued until some time after 12:30 p.m. when Lori Maestas Barela got to the property and told Defendants that she would call the State Police to get them off of the land. This evidence establishes that Defendants should have known that the property that they were destroying was Plaintiffs' property and that by remaining on the land and continuing to cut down trees and cut a road, their conduct rose to a level of reprehensibility that warranted a punitive damage award against them.

Next, we consider the second factor and "compare the punitive damages award to the actual or potential harm suffered by Plaintiffs." *Chavarria*, 2006-NMSC-046, ¶ 38. Here, the punitive damages award was approximately one-half of the amount of harm actually suffered by Plaintiffs, but because the statute doubled Plaintiffs'

22

recovery, the punitive damages award was one-fourth of the final compensatory damages award. *See* § 30-14-1.1(D) (establishing double recovery for trespass damages). This ratio is not unconstitutional, as it is not even equal to the damages award. *See Grassie v. Roswell Hosp. Corp.*, 2011-NMCA-024, ¶ 57, ___ N.M.___, ___ P.3d ___ (concluding that a ratio just slightly greater than 10:1 punitive damages to compensatory damages was "on the outer edge of the range that could be considered perhaps presumptively acceptable[, b]ut it [was] not so large as to raise concerns of constitutional dimension").

Finally, we consider the last factor and compare the punitive damages award to potential civil and criminal sanctions. This factor is the least important in our analysis. *See Chavarria*, 2006-NMSC-046, ¶ 39 ("The possibility of a jail sentence justifies a . . . punitive damages award." (internal quotation marks and citation omitted)). As a crime, trespass is a misdemeanor under NMSA 1978, Section 30-14-1(D) (1995). In New Mexico, misdemeanors are punishable by up to one year in jail or up to $1000 in fines or both. NMSA 1978, § 31-19-1(A) (1984). The potential for both civil and criminal liability in this case weighs in favor of the reasonableness of the punitive damages award. Therefore, after consideration of the three *Aken* factors, we conclude that the punitive damages award in this case was not excessively high so as to violate Defendants' due process rights.

Plaintiffs argue that we should use the *Aken* framework to evaluate what they contend was a disproportionately low award of punitive damages. However, the *Aken* framework is used to evaluate awards of punitive damages for excessiveness, as the Supreme Court in *BMW* opined that an "excessive award" is unconstitutional because it violates the defendant's right to due process of law. *See BMW*, 517 U.S. at 568 ("Only when an award can fairly be categorized as 'grossly excessive'. . . does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment."). Plaintiffs cite to no authority that a small punitive damages award could violate the due process rights of a plaintiff or that the framework has ever been used to increase a punitive damages award. Therefore, we assume there is none. *See In re Adoption of Doe*, 100 N.M. 764, 765, 676 P.2d 1329, 1330 (1984) (stating that where a party cites no authority to support an argument, we may assume no such authority exists). Accordingly, we hold that the award was not unconstitutionally low.

Plaintiffs offer an alternative argument: Even if we conclude that the low punitive damage award does not violate their due process and equal protection rights under the *Aken* framework, then we can still conclude that the district court abused its discretion in only awarding $1000 per Defendant. However, we note that a district court only abuses its discretion if its decision is contrary to logic and reason and that "[p]untive damages are not awarded as a matter of right, but lie within the sound

24

discretion of the district court." *Skeen v. Boyles*, 2009-NMCA-080, ¶ 36, 146 N.M. 627, 213 P.3d 531 (alterations, internal quotation marks, and citation omitted).

Here, we have concluded that the district court's award was reasonable, in that it was not so great as to deny Defendants their due process rights. However, there was some degree of reprehensibility in Defendants' conduct for which a punitive damages award was acceptable. The district court's award of $1000 per Defendant is proportionate to the degree of the offense in this case and is both sufficient to punish for the bad behavior and is also significant enough to deter such action by Defendants in the future. *See Bogle v. Summit Inv. Co.*, 2005-NMCA-024, ¶ 34, 137 N.M. 80, 107 P.3d 520 ("Punitive damages are intended to punish the defendant and to deter future wrongdoing." (internal quotation marks and citation omitted)). Plaintiffs are not entitled to a greater punitive damages award merely because other courts have punished other defendants conduct more severely, especially where Defendants are also liable for double compensatory damages under the statute. *Cf. Akins v. United Steel Workers of Am.*, 2010-NMSC-031, ¶¶ 8, 20, 148 N.M. 442, 237 P.3d 744 (holding that a compensatory award of around $1600 would not sufficiently deter future bad conduct of a union defendant so a punitive damages award of $30,000 was both reasonable and appropriate). Nothing in the district court's decision was contrary

to logic or reason and, thus, it was not an abuse of discretion. Accordingly, we will not remand this case for imposition of a higher punitive damages award.

**Plaintiffs Are Responsible for Their Own Attorney Fees**

In the cross-appeal, Plaintiffs contend that the district court abused its discretion in denying their attorney fees and argue that we should create an exception to the American rule and allow an award of attorney fees in this case. We review the district court's decision to deny attorney fees for an abuse of discretion. *See Paz v. Tijerina*, 2007-NMCA-109, ¶ 8, 142 N.M. 391, 165 P.3d 1167.

New Mexico follows the American rule, under which, "absent statutory or other authority, litigants are responsible for their own attorney's fees." *N.M. Right to Choose/NARAL v. Johnson*, 1999-NMSC-028, ¶ 9, 127 N.M. 654, 986 P.2d 450 (internal quotation marks and citation omitted). Underlying the rule are two important policies: first, "the American rule promotes equal access to the courts for the resolution of bona fide disputes[,]" and second, it "tends to preserve judicial resources." *Id.* ¶¶ 12-13 (alteration, internal quotation marks, and citation omitted). Although, we have recognized exceptions to the rule, those exceptions "are limited in number and narrow in scope." *Id.* ¶ 15. They include "(1) exceptions arising from a court's inherent powers to sanction the bad faith conduct of litigants and attorneys, (2)

exceptions arising from certain exercises of a court's equitable powers, and (3) exceptions arising simultaneously from judicial and legislative powers." *Id.*

Plaintiffs contend that an exception would be appropriate and would further the goals of the American rule in cases like this because in property trespass cases, unlike personal injury cases, the damages awarded are not very significant, but the litigants may have had to pay a substantial amount of money in attorney fees. They reason that such an exception in these cases would promote equal access to the courts and would discourage individuals like Defendants from unfounded attacks against property rights.

Plaintiffs' argument does not bring them within the narrow exceptions that we have previously recognized, and nothing in their argument warrants a new exception. Plaintiffs are essentially just arguing that the American rule should not apply in cases where damages are low. We recognize a tension between Plaintiffs' argument and our policy of not discouraging losing litigants from fairly prosecuting or defending a claim. *See id.* ¶ 18. However, we have not adopted a rule that allows a winning litigant to recover attorney fees just because their actual damages were low. Plaintiffs have not cited any authority from outside jurisdictions that have granted an extension for cases like this that could be persuasive to us. We are mindful that the Legislature has already provided for double the appraised value of damages in trespass claims,

27

such that their recovery is greater than the value of the damages that they suffered. *See* § 30-14-1.1(D) (providing that trespassers shall be liable for double damages to owners, lessees or others in lawful possession of the property trespassed upon).

Thus, we decline to create a new exception for property trespass cases. Because we do not adopt a new exception for attorney fees in property trespass cases, we cannot say that the district court's decision to deny attorney fees in this case was illogical or unreasonable. *See N.M. Right to Choose/NARAL*, 1999-NMSC-028, ¶ 8 (concluding that the district court did not abuse its discretion in denying attorney's fees when the district court did not adopt the private attorney general doctrine as a matter of law and stating that a district court's decision is an abuse of discretion if it is contrary to logic and reason).

**CONCLUSION**

For the foregoing reasons, we affirm the judgment of the district court.

**IT IS SO ORDERED.**


_____
**LINDA M. VANZI, Judge**

28

**WE CONCUR:**

_____
**CELIA FOY CASTILLO, Chief Judge**

_____
**MICHAEL E. VIGIL, Judge**