**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: _____

Filing Date:  September 16, 2014

Docket No. 32,178

STEVEN JONES, D.O., BRANT BAIR, M.D. AND
SANFORD DAVID SCHULHOFER, D.P.M. and
THE NORTHERN NEW MEXICO ORTHOPAEDIC
CENTER, P.C.,

       Plaintiffs/Counter-Defendants/Appellees,

v.

WAYNE K. AUGÉ, II, Individually and as Trustee
of the Covalent Global Trust U/T/I dated 12/1/03,

       Defendant/Counter-Plaintiff/Appellant.

APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY
Raymond Z. Ortiz, District Judge

Law Office of Jane B. Yohalem
Jane B. Yohalem
Santa Fe, NM

Jeffrey R. Brannen
Santa Fe, NM

for Appellees

Moody & Warner, P.C.
Christopher M. Moody
Albuquerque, NM

Lorenz Law
Alice T. Lorenz
Albuquerque, NM

for Appellant

1

**OPINION**

**BUSTAMANTE, Judge.**

**{1}**     Appellees Steven Jones, D.O., Brant Bair, M.D., Sanford David Schulhofer, D.P.M., and the Northern New Mexico Orthopaedic Center, P.C. (NNMOC) brought suit against Wayne K. Augé, II, M.D. (Appellant) for fraud in the inducement, misrepresentation, breach of contract, securities fraud, breach of fiduciary duty to shareholders, breach of fiduciary duty to corporation, and prima facie tort after Jones, Bair, and Schulhofer discovered that, unbeknownst to them, Appellant had included in his shareholder employment agreement a deferred compensation clause that was significantly different from—and more generous than—theirs.  In the course of discovery, Appellees also learned that Appellant had caused NNMOC to overcompensate him by over $370,000.  After a bench trial, the district court found in favor of Appellees and awarded compensatory and punitive damages.  Appellant appeals.  We affirm the judgment with the exception of one item of compensatory damages that we remand for reconsideration.[1]

**PREFATORY MATTERS**

**{2}**     The district court entered 234 findings of fact and forty-five conclusions of law. Appellant challenges fifty-nine of the findings of fact.  In addition to the arguments in his brief in chief, Appellant makes several new arguments in his reply brief.  In reviewing his arguments, we are guided by several principles of appellate review.  First, "[o]n appeal, a reviewing court liberally construes findings of fact adopted by the fact finder in support of a judgment[.]" *Toynbee v. Mimbres Mem'l Nursing Home*, 1992-NMCA-057, ¶ 16, 114 N.M. 23, 833 P.2d 1204.  Second, "such findings are sufficient if a fair consideration of all of them taken together supports the judgment entered below." *Id.*  Third, "[w]e have long held that findings are sufficient where they justify the judgment, though they intermingle matters of fact and conclusions of law." *Watson Land Co. v. Lucero*, 1974-NMSC-003, ¶ 5, 85 N.M. 776, 517 P.2d 1302.  Fourth, appellate courts generally "do not address issues raised for the first time in a reply brief, [unless] the arguments in [the a]ppellants' reply brief . . . are 'directed only to new arguments or authorities presented in the answer brief.' " *Mitchell-Carr v. McLendon*, 1999-NMSC-025, ¶ 29, 127 N.M. 282, 980 P.2d 65 (quoting Rule 12-213(C) NMRA (1999)).  Fifth, "[w]e will not review unclear arguments, or guess at what [an appellant's] arguments might be." *Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076.

**{3}**     Applying these principles, we decline to review Appellant's arguments that "[v]irtually all 'overpayment' from 2007 through 2009 resulted from . . . adding depreciation to the expenses attributable to each shareholder" and that Appellees failed to prove damages

---

[1]Though not a matter of particular substance in this case, we also reverse the conclusion that a prima facie tort was committed.

related to securities fraud, because they were first raised in the reply brief. We also decline to address Appellant's contentions that the district court intermingled findings of fact and conclusions of law or other arguments, the resolution of which would have no impact on the judgment.

**{4}** Rule 12-213(A)(3) requires appellants to provide "a summary of the facts relevant to the issues presented for review." New Mexico case law is clear that this requirement compels appellants to set out a full summary of the pertinent evidence admitted at trial, including the facts supporting the district court's findings and conclusions, and that this Court may decline review for failure to do so. *See, e.g.*, *Chavez v. S.E.D. Labs.*, 2000-NMCA-034, ¶ 26, 128 N.M. 768, 999 P.2d 412 ("[W]e review substantial evidence claims only if the appellant apprises the Court of all evidence bearing upon the issue, both that which is favorable and that which is contrary to appellant's position. Failure to do so may result in our deeming the issue waived." (citations omitted)), *aff'd in part, rev'd in part*, 2000-NMSC-034, 129 N.M. 794, 14 P.3d 532; *see also Gish v. Hart*, 1966-NMSC-028, ¶ 10, 75 N.M. 765, 411 P.2d 349. Rule 12-213(A)(3) reflects the standard of review we apply to challenges to factual findings where "it is the supporting evidence, not that adverse to the finding, that ordinarily determines the issue." *Gish*, 1966-NMSC-028, ¶ 10. Here, Appellant's summary of the evidence comes perilously close to being too one-sided for review. We conclude that Appellant complied with the rule sufficiently to allow review. *See State v. Martinez*, 1996-NMCA-109, ¶ 13, 122 N.M. 476, 927 P.2d 31 (stating that non-compliance with Rule 12-213(A)(3) "does not require this Court to disregard an issue when an appellant fails to comply with its provisions"). But we again urge all counsel appearing before us to abide by the spirit and letter of the rule.

## BACKGROUND

### The Parties

**{5}** The NNMOC is a professional corporation of orthopaedic surgeons founded by Appellant in 1998. Dr. Wise was an NNMOC shareholder from 1998 to 2008. Drs. Jones, Bair, and Schulhofer joined NNMOC as shareholders in 2007, 2008, and 2009, respectively. The shareholders each owned the same amount of stock in NNMOC.

### Shareholder Agreements

**{6}** Jones, Bair, Schulhofer, and Appellant each signed a shareholder employment agreement, a shareholder agreement, and a subscription agreement that collectively set out their rights and obligations as shareholders of NNMOC. Because the terms of the shareholder employment agreements are most at issue, we provide a summary of their critical terms. Details about the other agreements are provided as needed in our discussion.

**{7}** The shareholder employment agreement governs the shareholders' compensation, deferred compensation, and termination. Compensation for each shareholder is based on

each physician's "direct physician gross revenue," which is defined as "all revenues *collected* by NNMOC on account of medical services provided by Physician to NNMOC patients net of New Mexico gross receipts taxes." The compensation clause goes on to state that:

> Physician shall be entitled to receive as compensation for all services rendered by Physician under this Agreement during the term hereof ("Physician's Compensation") an amount equal to:
>
> the sum of:
>     (i)    Direct Physician Gross Revenues, *plus*
>     (ii)    a percentage of revenues collected by NNMOC on account of Ancillary Services equal to the percentage of the total common stock of NNMOC owned by Physician,
>
> less:
>
> the amount of NNMOC's overhead attributable to Physician.

{8}    "Ancillary services" are defined as "x-rays, physical, occupational and other therapy services, physician assistant services, soft goods, medications, cast supplies, medical supplies, and other products or services not provided directly by Physician[.]"

{9}    Under the compensation clause, each shareholder is paid a salary based on the "anticipated amount of Physician's Compensation." In addition, "[a]t the end of each quarter, if Physician's Compensation exceeds the amount of Physician's [s]alary during such quarter, the difference will be paid to Physician as additional salary." The parties referred to this payment as a "bonus." If, on the other hand, the salary is more than Physician's Compensation for the quarter, each shareholder "will be liable to repay NNMOC the difference between [the s]alary and Physician's Compensation." The compensation clause is the same for all shareholders.

{10}    In contrast to the compensation clause, Appellant's deferred compensation clause differs from that in Appellees' shareholder employment agreements. The deferred compensation clause in Appellees' shareholder employment agreement provides for payment of sixty percent of direct physician gross revenues for six months after termination in compliance with the termination clause. Appellant's deferred compensation clause provides for eighty percent of direct physician gross revenues for six months and twenty percent of ancillary services revenue for three years after termination. This difference and, more importantly, how it came about, forms the basis for Appellees' fraud claims, as well as a portion of their breach of fiduciary duty claims.

**Procedural Background**

4

**{11}** Appellees sued Appellant for fraud, misrepresentation, breach of contract, securities fraud, breach of fiduciary duty to shareholders, breach of fiduciary duty to corporation, and prima facie tort. They also sought declaratory judgment that the deferred compensation clause in Appellant's shareholder employment agreement is void to the extent it differs from that in Appellees' shareholder employment agreements. Appellant denied all claims and counterclaimed, alleging breach of contract, minority shareholder oppression, breach of fiduciary duty, and tortious interference with contract. He also requested "an accounting of the assets and liabilities of NNMOC."

**{12}** Just before trial, the district court granted Appellees' motions for summary judgment both with regard to the proper methodology for calculating the value of NNMOC shares when a shareholder's employment is terminated and the exclusion of non-shareholder physician employee revenues from ancillary services revenue. It denied summary judgment as to when Appellant had ceased being a shareholder and whether Appellant's deferred compensation clause violated 42 U.S.C. § 1395nn (2012), which "prohibit[s] physicians from making referrals to, and prohibit[s] laboratories from billing Medicare for, services ordered by physicians who have a financial interest in the laboratory." *Atl. Urological Assocs., P.A. v. Leavitt*, 549 F. Supp. 2d 20, 22 (D.D.C. 2008). The parties proceeded to trial on all other issues.

**{13}** After a bench trial, the district court entered extensive findings of fact and conclusions of law. In sum, the district court concluded, among other things, that Appellant made knowing misrepresentations to Jones, Bair, and Schulhofer; committed securities fraud by inducing them to become shareholders; fraudulently induced Jones, Bair, and Schulhofer into signing the shareholder employment agreements; committed a continuing fraud and breached his fiduciary and other duties to Appellees and NNMOC by knowingly overcompensating himself and by concealing from Appellees that he had done so; breached his shareholder employment agreement and shareholder agreement; and committed prima facie tort. It also found that "all of the claims brought by [Appellant] in this matter [are] without merit" and denied Appellant's request for an accounting.

**{14}** The final judgment ordered Appellant to pay NNMOC $527,821.49 for his negative balance with the corporation, which includes the amount Appellant was overcompensated and the amount he failed to pay in overhead costs. Appellant was also ordered to pay $72,936.32 for the negative value of his NNMOC shares. The district court also awarded $1 million in punitive damages. Finally, the district court granted Appellees' request for declaratory relief that "Paragraph 8 of [Appellant's] [s]hareholder [e]mployment [a]greement is null and void to the extent it grants deferred compensation to [Appellant] which is different than that set forth in [Appellees'] deferred compensation provision[]."

**{15}** The district court based its conclusions of law and judgment on the findings of fact, which reflect a pattern of self-dealing and misrepresentation made possible by Appellant's control of corporate records and financial matters. If the district court's findings of fact are supported by substantial evidence in the record, the judgment must be affirmed.

**{16}** The findings of fact reveal that Appellant founded NNMOC in 1998. In 2005, after Appellee Jones became a non-shareholder employee, Appellant began talking to him about becoming a shareholder in NNMOC. Jones decided to become a shareholder based on Appellant's representations that NNMOC would be a firm of equals. Appellant, with the help of NNMOC's attorney, prepared a form of shareholder employee agreement. Appellant led Jones to believe that his shareholder employment agreement was the same as Appellant's with two exceptions: Appellant did not have a non-compete clause, and he could be terminated for cause only. Jones accepted the proposed shareholder employment agreement with the understanding that both the current and deferred compensation provisions were identical to Appellant's. Jones signed his agreements on or about July 31, 2007.

**{17}** Unbeknownst to Jones, Appellant modified his shareholder employment agreement within a month or two thereafter, putting in place a materially more generous deferred compensation package for Appellant. Appellant never told Jones about the changes he had instituted.

**{18}** Later, in 2008 and 2009, Appellant induced Appellees Bair and Schulhofer to become shareholders of NNMOC in part by making the same representations he had made to Jones concerning the compensation package. Appellant never showed his shareholder employment agreement to Jones, Bair or Schulhofer. In fact, Appellant kept tight control of the corporate records as a whole, keeping them with him and not making the records available at the offices of NNMOC.

**{19}** Jones, Bair, and Schulhofer did not discover that the deferred compensation packages differed until January 2010. Appellant had approached them a few months before with the idea of taking a leave of absence, and it was during the negotiations for the terms of the leave that the difference was disclosed by NNMOC's attorney. After disclosure of the difference between the shareholder employment agreements, negotiations for the leave of absence could not be successfully completed, and Appellant resigned in November 2010.

**{20}** After his resignation, Appellees started this litigation seeking damages and a declaration nullifying Appellant's shareholder employment agreement to the extent it was different from the other shareholder employment agreements with regard to deferred compensation. In the course of discovery, Appellees learned that Appellant had substantially overcompensated himself in 2008 and 2009 and had hidden the overcompensation from his fellow shareholders, NNMOC's external accountant, and its internal practice manager. Appellant was able to hide the overpayments because he maintained control of corporate finances—in particular the calculation of bonuses under the shareholder employment agreements—to the exclusion of everyone else. Appellant alone calculated the bonuses. Appellant controlled and kept in his possession the paper files on which he reported his calculations and did not share them or his calculations with anyone. The overpayments in 2008 and 2009 amounted to over $370,000, an amount which materially adversely affected his fellow shareholders and NNMOC.

**{21}** Other pertinent findings of fact will be outlined as needed in the following discussion.

## DISCUSSION

**{22}** Appellant makes five main arguments: three relate to liability issues and two relate to damages. As to liability, Appellant maintains that Appellees failed to prove fraud and argues that a breach of fiduciary duty cannot be based on contractual duties. Appellant also argues that the prima facie tort cannot be based on the same facts as other torts. In relation to damages, he argues that the amount of compensatory damages should be reduced and that the award of punitive damages was improper. We begin with the liability arguments.

## I.    Liability

## A.    Fraud

**{23}** Appellant makes two arguments to the effect that Appellees failed to prove fraud in the inducement or securities fraud. We address them in turn.

## 1.    Voidness/Materiality

**{24}** Appellant argues that Appellees failed to prove fraud in the inducement or securities fraud because his deferred compensation clause was void ab initio or because his representations about the clause were immaterial. Both arguments are based on misinterpretations of the district court's findings.

**{25}** Appellant's position that the deferred compensation clause was void ab initio rests on two of the district court's conclusions. First, Appellant relies on the district court's use of the term "void ab initio" to argue that the deferred compensation clause in Appellant's agreement "never could have had any legal effect." Appellant overstates the significance of the district court's use of the term. The referenced conclusion states, "The language of [Appellant's] [s]hareholder [e]mployment [a]greement regarding his deferred compensation benefit based on a percentage of ancillary services revenue is void ab initio because it violates [42 U.S.C. § 1395nn]." (Emphasis omitted.) This language refers specifically to the provision in Appellant's agreement entitling him to a percentage of the ancillary services revenue for three years after termination from NNMOC. It does not address the other portion of Appellant's deferred compensation clause that is different from the clauses in Appellees' agreements, i.e., the provision giving him eighty percent of direct physician gross revenues. Thus, the district court concluded only that the ancillary services revenue provision violated 42 U.S.C. § 1395nn and that only that provision was void. It did not conclude that the entire clause was void ab initio.

**{26}** Second, Appellant points to the district court's conclusion that "[t]he [s]hareholder [e]mployment [a]greement of [Appellant] is not a valid contract between him and

7

[NNMOC]." He directs us to *AMX International, Inc. v. Battelle Energy Alliance, LLC*, a federal district court case, in which AMX sued Battelle, its client, for tortious interference with contract after Battelle hired several AMX employees in spite of the fact that the employees' contracts with AMX included non-compete clauses precluding them from working for AMX clients. 744 F. Supp. 2d 1087, 1089-90 (D. Idaho 2010). Battelle argued that it could not have interfered with AMX's contracts with its employees because the contracts were unenforceable because the non-compete clause was contrary to public policy. *Id.* at 1093. The court stated that although "protection is extended against unjustifiable interference with contracts even though the contract is voidable or unenforceable in an adversary proceeding[,] . . . this protection does not extend to contracts void ab initio." *Id.* (alteration, internal quotation marks, and citation omitted). It concluded that "[c]ontracts that are void ab initio are deemed never to have existed in the eyes of the law and cannot form the basis for a tortious interference action." *Id.* Having set out this rule, the court went on to examine whether the non-compete clause in AMX's contract was "void ab initio or simply voidable." *Id.* It concluded that because AMX's non-compete clause was unreasonably broad, it violated public policy and was, therefore, void ab initio. *Id.* at 1095. It concluded that "the contracts, which were unenforceable as written, cannot support AMX's action against Battelle for tortious interference with contract." *Id.*

**{27}** *AMX* is distinguishable from this case. While contract clauses that violate public policy are void, i.e., "[o]f no legal effect[,]" *Black's Law Dictionary* 1709 (9th ed. 2009), where, as here, there is fraud in the inducement to enter into the contract, the contract is merely voidable, i.e., "capable of being affirmed or rejected at the option of one of the parties." *Id.*; *see McLean v. Paddock*, 1967-NMSC-165, ¶ 10, 78 N.M. 234, 430 P.2d 392 (stating that "[w]here [fraud] is in the inducement, the instrument is voidable," not void), *overruled on other grounds by Duke City Lumber Co. v. Terrel*, 1975-NMSC-041, 88 N.M. 299, 540 P.2d 229. When a contract or clause is voidable, it remains in effect "until the fraud by which [the defrauded party] had been induced to sign [is] discovered." *Gross, Kelly & Co. v. Bibo*, 1914-NMSC-085, ¶ 35, 19 N.M. 495, 145 P. 480. Thus, here, unlike in *AMX* and contrary to Appellant's position, the deferred compensation clause continued in full force and effect until Appellees' request for modification of it was granted by the district court.

**{28}** Finally, we interpret the district court's conclusion that the agreement was "not a valid contract" to incorporate both the district court's determination that Appellant's deferred compensation clause was voidable and that it was in fact void at the request of Appellees. *See Golden Cone Concepts, Inc. v. Villa Linda Mall, Ltd.*, 1991-NMSC-097, ¶ 8, 113 N.M. 9, 820 P.2d 1323 ("When a party is challenging a legal conclusion, [we examine] whether the law correctly was applied to the facts, viewing them in a manner most favorable to the prevailing party, indulging all reasonable inferences in support of the court's decision, and disregarding all inferences or evidence to the contrary."). This interpretation is supported by the fact that Appellees' complaint sought modification of the deferred compensation clause, not avoidance of the entire contract and the judgment orders only reformation of the clause, not rescission of the entire contract.

8

**{29}** We turn next to Appellant's contention that his representations about the deferred compensation clause were immaterial. He argues that "a representation about . . . [the deferred compensation clause], which was not intended to be enforced, cannot support a fraud claim, because fraud requires clear and convincing proof that a *material* fact was misrepresented or concealed." Appellant relies on the district court's finding that "[Appellant] told . . . Bair that the [deferred compensation clause] w[as] put in only as a safety net in the event that a new corporation . . . would be formed by the [Appellees that did not include Appellant]. He assured . . . Bair that the provision no longer applied." Appellant interprets this statement as a finding that he in fact did not intend to enforce the clause and characterizes it as a finding that the deferred compensation clause was not a material term of the agreement. But this finding merely reflects the district court's determination that Appellant made certain statements and does not indicate that the district court found that Appellant did not actually intend to enforce the clause. Appellant's reading would not be consistent with the tenor of the district court's findings about how the clause came into existence and the lengths Appellant went to hide its existence from his fellow shareholders and the numerous findings that they in fact relied on his misrepresentations. Thus, the finding has no bearing on the materiality of Appellant's representations.

**{30}** Appellant also makes a cursory argument that, because the district court concluded that execution of the later agreements "constitute[s] a corporate modification of [Appellant's] deferred compensation provision[,]" his deferred compensation clause was not a material, enforceable term at the time Appellees signed their shareholder employment agreements and, therefore, he could not have committed fraud by misrepresenting it. This argument rests on the premise that Appellant's deferred compensation clause would never have been enforceable. But there is nothing inherent about the shareholder employment agreements that would make differing clauses necessarily unenforceable. In fact, Appellees did not raise any arguments related to the other differences in the shareholder employment agreements. Just as they agreed to those terms, it is possible that the parties might have agreed to Appellant's deferred compensation provision, or some variation of it, had he not lied about it. Instead, it was because of Appellant's misrepresentation of the terms that Appellees challenged Appellant's deferred compensation clause. The fact that the district court concluded after trial that Appellant's deferred compensation clause was modified does not preclude a finding that Appellant's misrepresentations about his deferred compensation clause were material to Appellees when made. To treat them otherwise would be absurd: Appellees would be deprived of a remedy because they proved that the clause should not be enforced.

**{31}** In sum, we conclude that the deferred compensation clause, with the exception of the language contrary to 42 U.S.C. § 1395nn, was in full force and effect until it was reformed and, therefore, was an adequate basis for Appellees' fraud in the inducement claim. We also conclude that neither Appellant's statements about his intent to enforce his deferred compensation clause nor the district court's conclusion that it was modified preclude a finding that Appellant's deferred compensation clause was a material term of his shareholder employment agreement.

## 2.      Justifiable Reliance

**{32}**      Appellant next argues that Appellees failed to prove fraud when they failed to prove an essential element—that they justifiably relied on his representations.  Although he styles this argument as a challenge to the district court's findings, several of his assertions relate more to the legal significance of the district court's findings than to the findings themselves. For instance, Appellant maintains that "[w]here, as here, the alleged misrepresentations were with respect to a document all [Appellees] admitted they were told to read, justifiable reliance was absent as a matter of law."  Appellant's statement of the law is incorrect. Although "each party to a contract has a duty to read and familiarize himself with the contents of the contract, each party generally is presumed to know the terms of the agreement, and each is ordinarily bound thereby," *Ballard v. Chavez*, 1994-NMSC-007, ¶ 8, 117 N.M. 1, 868 P.2d 646, where a party acts in good faith and "in accordance with reasonable standards of fair dealing[,]" *id.* (internal quotation marks and citation omitted), failure to do so does not automatically preclude a finding of justifiable reliance.  *See Sisneros v. Citadel Broad. Co.*, 2006-NMCA-102, ¶ 23, 140 N.M. 266, 142 P.3d 34 (holding that summary judgment as to whether a party justifiably relied on the other party's representations when the first party failed to read the entire contract was improper where the "[p]laintiff . . . produced evidence giving rise to factual inferences that could reasonably support the determination that his failure to read the agreement was justified by [the other party's] conduct").  Furthermore, because "[a] fraudulent misrepresentation is an intentional tort[,] . . . the plaintiff's recovery is not barred by his own negligence which has contributed to his loss."  Restatement (Second) of Torts § 545A cmt. a (1977).  Finally, negligent reliance may be justified "when there is a relation of trust and confidence between the parties or the defendant has made successful efforts to win the confidence of the plaintiff and then takes advantage of it to deceive him."  *Id.* cmt. b.

**{33}**      The determination of whether a party's reliance on the other party's representations was justified "is fact-specific and includes consideration of the conduct of both parties." *Sisneros*, 2006-NMCA-102, ¶ 22.  Thus, we examine the record to see whether the evidence supports the district court's finding of justifiable reliance.  *See Varbel v. Sandia Auto Elec.*, 1999-NMCA-112, ¶ 18, 128 N.M. 7, 988 P.2d 317 ("A finding of fraud normally requires proof by clear and convincing evidence.").  In doing so, we "view the evidence in the light most favorable to the prevailing party, and . . . determine therefrom if the mind of the fact[]finder could properly have reached an abiding conviction as to the truth of the fact or facts found."  *Duke City Lumber Co.*, 1975-NMSC-041, ¶ 5.

**{34}**      Jones, Bair, and Schulhofer all testified that Appellant told them that the shareholders of NNMOC would be equal partners and that the shareholder employment agreements were the same with the exception of the termination and non-compete clauses.  They testified that these representations were critical to their decisions to become shareholders in NNMOC. Jones's conversations with Appellant about the shareholder arrangements and the structure of the corporation had continued over months or years.  Jones considered Appellant a mentor and friend.  Schulhofer and Bair testified that Appellant did not tell them about the deferred

10

compensation clause in his agreement even when they questioned him about the agreements. Bair testified that Appellant kept the corporate documents, including the shareholders' agreements, in his possession, not at the NNMOC offices. And the practice manager for NNMOC testified that no corporate documents were kept at the NNMOC offices. Appellees first learned of the deferred compensation clause in Appellant's agreement in early 2010. This evidence is sufficient to support the district court's findings that Appellees justifiably relied on Appellant's representations about the shareholder agreements.

{35}    To the extent Appellant argues that, after becoming shareholders and officers of NNMOC, Appellees breached their duty to properly oversee NNMOC and that "their claims resulted in large part from their ongoing failure to meet their fiduciary duties[,]" we are unpersuaded. Appellant relies on NMSA 1978, § 53-11-35(B) (1987), which states that "[a] director shall perform his duties . . . in good faith, in a manner the director believes to be in . . . the best interests of the corporation, and with such care as an ordinarily prudent person would use under similar circumstances in a like position." He maintains that "[h]aving steadfastly ignored their duties of care and oversight, . . . none of [Appellees] could establish justifiable reliance on [Appellant's mis]representation or non-disclosure" after they became officers of NNMOC. But Appellant overlooks the remainder of Section 53-11-35(B)(1), which provides that "a director shall be entitled to rely on . . . reports or statements, including financial statements and other financial data, in each case prepared or presented by . . . officers . . . of the corporation whom the director reasonably believes to be reliable and competent in the matters presented[.]" Here, Appellant founded NNMOC and was its president and treasurer for approximately nine years before Appellees became shareholders. When Bair joined in 2008, Appellant became its treasurer and secretary. Several witnesses testified that Appellant controlled NNMOC's financial matters. Given this history, we conclude that the evidence supports the district court's findings that Appellees reasonably relied on Appellant's representations and that these findings support the district court's conclusion that "[Appellees] had no duty to audit or otherwise discover [Appellant's] misdeeds."

{36}    Finally, Appellant argues that Appellees' reliance on his representations was obviated by clauses stating that the written agreements supersede all other agreements and representations, including oral representations. For instance, the shareholder employment agreement states,

> This Agreement constitutes the entire agreement and understanding of the parties with respect to the subject matter hereof, and supersedes all prior oral or written agreements, arrangements, and understandings with respect thereto. No representation, promise, inducement, statement[,] or intention has been made by any party hereto that is not embodied herein, and no party shall be bound by or liable for any alleged representation, promise, inducement, or statement not so set forth herein.

{37}    Appellant's reliance on these clauses is misplaced because "in New Mexico

11

exculpatory clauses do not preclude liability." *Golden Cone Concepts, Inc.*, 1991-NMSC-097, ¶ 6. A party fraudulently induced to enter into a contract "cannot be precluded from seeking redress by a provision inserted in the contract by the party perpetrating the fraud, designed to shut the mouth of the adverse party as to such fraudulent representations which led up to the making of the contract." *Id.* (internal quotation marks and citation omitted) (holding that the district court correctly permitted the plaintiff to proceed on its fraud and misrepresentation claims when the contract included an exculpatory clause similar to that here). We conclude that the clauses referenced by Appellant do not present a barrier to Appellees' suit or Appellant's liability.

## B. Breach of Fiduciary Duty

{38} Appellant argues that "the judgment based upon breach of fiduciary duty must be reversed" because the district court's findings of a breach of fiduciary duties were based on Appellant's failure to pay his share of overhead costs and the negative value of his NNMOC shares, which, he maintains, are duties imposed by the shareholder employment agreement and the shareholder agreement, respectively. He argues that "breach of fiduciary duty claims cannot be based on contractual duties."

{39} Appellant's argument is both factually and legally flawed. First, the district court's findings related to Appellant's breach of fiduciary duties to Appellees and NNMOC are not based on Appellant's failure to pay overhead or the negative share value. Rather, the district court found that the fiduciary duty was breached when Appellant (1) failed to inform Appellees of "bonuses paid by him to him without appropriate basis"; (2) failed to inform Appellees of "material facts and information relating to [NNMOC's] business and financial affairs"; (3) "knowingly" submitted incorrect information about his bonuses to Appellees at shareholder meetings; (4) "knowingly and intentionally" paid himself bonuses "to the substantial economic detriment of [Appellees] . . . as well as to [NNMOC] itself." Thus, Appellant's position that the breach of fiduciary duty findings are based only on contractually-imposed duties is not supported by the record.

{40} Second, this Court has held that a breach of duties imposed by contract may also constitute a breach of the fiduciary duties of "loyalty, good faith, inherent fairness, and the obligation not to profit at the expense of the corporation." *See Walta v. Gallegos Law Firm, P.C.*, 2002-NMCA-015, ¶¶ 41, 46-47, 131 N.M. 544, 40 P.3d 449 (adopting the holding of *Fought v. Morris*, 543 So. 2d 167, 171 (Miss. 1989), and stating that "breach of [a] shareholder agreement could also be a breach of [a] fiduciary duty"). Although Appellant is correct in pointing out that not all breaches of a contract are necessarily breaches of a fiduciary duty, determination of "whether a breach of fiduciary duty has occurred will normally be a question of fact." *Walta*, 2002-NMCA-015, ¶ 47. Since the district court resolved this question in favor of Appellees and Appellant challenges the district court's findings, we examine the record for evidence supporting that determination. *See Bagwell v. Shady Grove Truck Stop*, 1986-NMCA-013, ¶ 23, 104 N.M. 14, 715 P.2d 462 (stating that in reviewing a district court's factual determination for substantial evidence, "[t]he appellate

court . . . disregards all evidence and all inferences unfavorable to the [district] court's result").

**{41}** We begin by defining "fiduciary duty." "The duty between shareholders of a close corporation is similar to that owed by directors, officers, and shareholders to the corporation itself; that is, loyalty, good faith, inherent fairness, and the obligation not to profit at the expense of the corporation." *Walta*, 2002-NMCA-015, ¶ 41. In other words, a fiduciary duty is "[a] duty of utmost good faith, trust, confidence, and candor owed by a fiduciary (such as a . . . corporate officer) to the beneficiary (such as a . . . shareholder)" and involves "a duty to act with the highest degree of honesty and loyalty toward another person and in the best interests of the other person (such as the duty that one partner owes to another)." *Black's Law Dictionary* 581 (9th ed. 2009). "An act that is detrimental to the interests of someone to whom a fiduciary duty is owed[,] esp[ecially] an act that furthers the actor's own interests" is a breach of loyalty. *Id.* at 214. The common thread between these statements is the idea that a fiduciary may not promote his interests above the interests of those to whom a duty is owed.

**{42}** Based on this principle, we examine the record for evidence that Appellant advanced his interests at the expense of Appellees or NNMOC. Under the substantial evidence standard, we "indulge[] all reasonable inferences in support of the prevailing party." *Las Cruces Prof'l Fire Fighters v. City of Las Cruces*, 1997-NMCA-044, ¶ 12, 123 N.M. 329, 940 P.2d 177. We conclude that the evidence supports the district court's findings of breach.

**{43}** Two witnesses testified about the amount overpaid to Appellant. NNMOC's accountant conducted an audit of the compensation of shareholders. She discovered that the amount paid to Appellant was "off" by "hundreds of thousands" of dollars. Edward Street, an expert in "accounting, business valuation, review and analysis of financial documents, and forensic accounting," testified that he compared the amount of compensation due to Appellant with the amount of compensation actually paid to determine if Appellant had been overpaid. Based on this analysis, he concluded that Appellant had been overpaid by $173,187.54 in 2007-2008, $199,233.83 in 2009, and $185,424.89 in 2010, for a total of $557,846.47, which was adjusted to $527,821.49. He also described the consequences of overpayment, stating, "if one of the doctors has been overpaid by several hundred thousand dollars, other doctors have to be underpaid by several hundred thousand dollars or the corporation has to be negative, has to spend more money than, in total, it has earned. . . . So if somebody is drawing more money than what is due them, it has to come from someplace else."

**{44}** In addition, the evidence supports the district court's finding that Appellant was the only person calculating "bonus" payments to shareholders on the shareholder allocation sheets that the shareholders used to track their compensation. Several witnesses testified that Appellant was either in charge of or closely involved with the generation of the shareholder allocation sheets. NNMOC's external accountant testified that she prepared the shareholder allocation sheets and gave them to Appellant. She stated that she would enter "the

13

breakdown of the income and the allocation of the expenses" but not the bonuses on the draft allocation sheet and send the sheet to Appellant. She and NNMOC's internal practice manager both testified that Appellant was their main point of contact for financial matters through early 2010. The internal practice manager never saw the allocation sheets prior to the litigation. Bair and Schulhofer testified that Appellant brought a single copy of the shareholder allocation sheets to meetings with the shareholders approximately monthly and that Appellant would take the copy with him after the meetings. He stated that "none of [the Appellees] had any active role in the finances until . . . 2010" when Appellant stopped working at NNMOC. Schulhofer described Appellant as "controll[ing]" the shareholder allocation sheets. We conclude that this evidence supports the district court's findings of breach of fiduciary duty based on Appellant's overcompensation.

**{45}** As to the findings of a breach of fiduciary duty based on Appellant's failure to inform Appellees of material facts related to NNMOC's finances, such as his deferred compensation clause, we conclude that the evidence also supports these findings. Appellees testified about Appellant's failure to inform them of the deferred compensation clause in his shareholder employment agreement, as discussed above. Appellant's deferred compensation clause would provide him with eighty percent of direct physician gross revenues and twenty percent of ancillary services revenue for three years, in contrast to Appellees' deferred compensation clause, which provides them with only sixty percent of direct physician gross revenue for six months and no income based on ancillary services revenue. Jones's testimony supports an inference that the effect of Appellant's deferred compensation clause would be to reduce the amount of ancillary services revenue for NNMOC and the other shareholders, contrary to what they understood when they signed the agreement. Schulhofer testified that having to pay Appellant according to his deferred compensation clause would be devastating to NNMOC, and possibly to him personally as well, stating that if the clause were valid "it[ would not be] in [his] interest to continue working. . . . So I would resign, which would mean, I assume, a bankruptcy for the business, and depending on the outcome of that, possibly a personal bankruptcy for myself to cover whatever liabilities we didn't meet." This evidence supports the district court's findings to the effect that Appellant promoted his own interests to the detriment of Appellees and NNMOC. We discern no error in the district court's conclusions related to breach of fiduciary duty.

## C. Prima Facie Tort

**{46}** Appellant argues that the district court erred in concluding that "[Appellant] committed a prima facie tort against [Appellees] and [NNMOC]." Appellees concede that the facts on which the prima facie tort was based "duplicate[ Appellees'] fraud and breach of fiduciary duty claims" and appear to agree that the district court's conclusion is, therefore, improper. We agree. *See Guest v. Allstate Ins. Co.*, 2009-NMCA-037, ¶ 33, 145 N.M. 797, 205 P.3d 844 ("New Mexico appellate courts have held that where a plaintiff does not assert any separate factual basis to support its prima facie tort claim, and the plaintiff's proof is susceptible to submission under another tort, the action should be submitted to the jury on the other cause of action and not as a prima facie tort claim"), *aff'd in part, rev'd in part*,

14

2010-NMSC-047, 149 N.M. 74, 244 P.3d 342. In Appellees' complaint, the only facts alleged in support of the prima facie tort claim were those "as set forth" in the fraud, securities fraud, breach of fiduciary duty, and breach of contract claims. No separate factual basis for the prima facie tort was established at trial. Thus, the district court's conclusion as to prima facie tort must be reversed. *See Bogle v. Summit Inv. Co., LLC*, 2005-NMCA-024, ¶ 24, 137 N.M. 80, 107 P.3d 520 (holding that prima facie tort was not available when "existing causes of action provided reasonable avenues to a remedy for the asserted wrongful conduct").

## II.    Damages

**{47}**    We turn now to Appellant's arguments as to the damages awarded. Appellant argues that the amount of compensatory damages should be reduced and that punitive damages were improperly awarded.

### A.    Compensatory Damages

**{48}**    "Generally, we review findings regarding damages to determine whether they are supported by substantial evidence." *Miller v. Bank of Am., N.A.*, 2014-NMCA-053, ¶ 28, 326 P.3d 20, *cert. granted*, 2014-NMCERT-005, 326 P.3d 1112. "Substantial evidence is that which a reasonable mind accepts as adequate to support a conclusion." *Id.* (internal quotation marks and citation omitted). We address each of Appellant's five arguments for reduction of the compensatory damages in the order presented.

### 1.    Overhead Expenses

**{49}**    As discussed above, each shareholder's compensation consists of the sum of their direct physician gross revenues and ancillary services revenue less a portion of NNMOC's overhead costs. Hence, each shareholder is responsible for his or her share of overhead expenses. Appellant argues that the compensatory damages award must be reduced by $154,655.55 because he ceased being a shareholder in January 2010, and thus he was no longer responsible for a portion of NNMOC's overhead expenses. Although Appellant does not dispute that he submitted a letter of resignation in November 2010, he maintains that Appellees had agreed during negotiations over his leave of absence to make his termination date retroactive to January 2010 if he did not return to work after six months. Since he did not return to work, he contends that the January termination date should apply.

**{50}**    The district court found that Appellant's status as a shareholder was terminated on December 30, 2010, thirty days after Appellant submitted a letter of resignation, and that his shareholder status was terminated as of that date pursuant to paragraph 7.1(d) of the shareholder employment agreement. It also found that Appellant "never sought termination" during the leave of absence negotiations and that "[h]e did not terminate those negotiations, or terminate his employment as he sought advantage in the negotiation." Hence, the district court implicitly rejected Appellant's argument that the parties had agreed to a termination

15

date of January 2010. Based on the finding of a termination date of December 2010, the district court found that Appellant "continued to be responsible for his share of overhead" until that date. Finally, the district court found that Appellant continued to receive a share of ancillary services revenue and other revenue from NNMOC during the leave of absence negotiations. Because Appellant challenges each of these findings, we review the record to determine whether they are supported by substantial evidence. *See Bagwell*, 1986-NMCA-013, ¶ 23.

**{51}** The heart of Appellant's challenge to these findings is his contention that Appellees agreed to make his termination date retroactive to January 2010 during the leave of absence negotiations. We therefore address that issue first. Bair testified that early in the negotiations Appellees proposed a termination date that would be retroactive to the date the leave of absence began, rather than the date it ended. Bair also testified, however, that in the course of negotiations Appellees reversed this position and proposed that the termination date would not be retroactive. Finally, he testified that no agreement on the terms of Appellant's leave of absence was ever reached. This testimony is supported by several exhibits admitted at trial, including (1) an email sent to Bair by Appellant in March 2010 in which Appellant acknowledges that agreement on the terms of the leave of absence had not been reached and stating, "It may be best for me to resign"; (2) a letter sent on June 7, 2010, in which Bair informed Appellant that NNMOC still considered him an employee of the corporation and that he was still responsible for his share of overhead costs; and (3) an email exchange in which Appellant acknowledges that the terms related to his termination date had not been resolved as late as June 29, 2010. This evidence is sufficient to support the district court's finding that the parties did not agree to a termination date in January 2010. Furthermore, since Appellant's only argument as to why the shareholder employment agreement's termination provision does not apply to him is that he had been terminated in January 2010, we conclude that substantial evidence also supports the district court's determination that that provision governed Appellant's termination.

**{52}** Turning to the district court's determination that Appellant continued to receive income through December 2010 and was responsible for a portion of overhead expenses incurred during that time, we conclude that these findings are supported by the record. Edward Street, Appellees' forensic accounting expert, testified that a portion of non-shareholder employee physician revenue and ancillary services revenue had been allocated to Appellant in 2010 and that Appellant had received a salary of over $30,000 in 2010. Street agreed with Appellees' counsel that these payments were pursuant to the shareholder employment agreement. He also agreed with counsel that "so long as [Appellant is] employed, he has to pay his share of the overhead." Appellant's shareholder employment agreement also requires that calculation of a shareholder's compensation must incorporate each shareholder's portion of overhead expenses. Thus, the terms of the shareholder employment agreement obliges shareholders to cover their portion of NNMOC's overhead expenses. We conclude that there is substantial evidence in the record to support these findings.

16

**{53}**     To the extent that Appellant maintains that the district court's finding that he was terminated in December 2010 is inconsistent with its finding that his share value should be determined as of January 2010, we disagree.  The employment termination date is governed by paragraph 7 of the shareholder employment agreement, whereas the date of valuation of the shares is governed by paragraph 6 of the shareholder agreement.  The shareholder agreement provides that "upon the occurrence of a [t]riggering [e]vent, the [c]orporation shall redeem the shares of stock owned by the [s]hareholder . . . upon the terms and for the purchase price set forth in [paragraph] 11."  Paragraph 6(D) provides that "in the case of the termination of the [s]hareholder's employment," the "triggering event" shall be "the earlier to occur of (i) the date set forth in the [s]hareholder's resignation . . ., or (ii) the last day on which the [s]hareholder actually performs services for the [c]orporation."  The district court found that the "triggering event" here was the date that Appellant stopped providing services, which is the earlier of the two options stated in paragraph 6(D).  Thus, it treated the termination of employment as a condition antecedent to the triggering event, which is consistent with the plain language of paragraph 6(D).  We discern no inconsistency in the district court's findings as to the employment termination date and the date for valuation of Appellant's shares.

## 2.     Inconsistent Accounting Treatment

**{54}**     Appellant next argues that the district court's findings based on Street's calculations of the damages are erroneous because Street handled a certain transaction differently than the NNMOC board of directors did.  Street testified that when Schulhofer became a shareholder, he paid $137,500 for his shares.  One-third of this amount was allocated to each of the other shareholders (Appellant, Bair, and Jones) on the shareholder allocation sheets.  When Street examined the NNMOC financial records and calculated the amounts paid to shareholders, he noted that stock purchase payments should be treated as capital contributions to the corporation, rather than income to shareholders.  Accordingly, he reallocated $43,833.33 each from Appellant, Bair, and Jones to NNMOC.  According to Street, this adjustment had the effect of reducing the amount NNMOC owed to Bair and Jones, whereas it increased the amount Appellant owed to NNMOC because he was already running a deficit.  Street's testimony supports the district court's finding that reallocation of the stock purchase payment of $137,500 "is required by sound accounting practices and [principles.]"

**{55}**     Appellant also argues that, because all of the shareholders had agreed to treat the stock purchase payment as income years before Street examined NNMOC's financial records, that treatment cannot "form the basis for a finding of breach of fiduciary duty" or breach of contract.  After a careful review of the district court's findings, we conclude there is no finding or conclusion by the district court indicating that it based its conclusions as to breach of contract or fiduciary duty specifically on the way these funds were treated.  Thus, we need not address this contention further.

## 3.     Responsibility for Dr. Wise's Negative Balance

**{56}** Appellant's third argument against Street's calculations is that the district court erred in finding that "[Appellant] was responsible for, directed and/or intended the entries reflecting his absorption of . . . Wise's [who ceased being a shareholder at the end of 2008] negative running balance and [Appellant] should be estopped from repudiating that action." Although the finding does not state the type of estoppel invoked, the language of the district court's finding evinces a reliance on the doctrine of acquiescence, "a species of estoppel." *Scott v. Jordan*, 1983-NMCA-022, ¶ 20, 99 N.M. 567, 661 P.2d 59. "[A]cquiescence arises where a person who knows that he is entitled to . . . enforce a right neglects to do so for such a length of time that, under the circumstances of the case, the other party may fairly infer that he has waived or abandoned his right." *Id.* (internal quotation marks and citation omitted). "Whether the defense of acquiescence has been established is a factual issue which must be decided under the facts existing in each case." *Id.* ¶ 21.

**{57}** Here, according to the shareholder agreement, Wise's negative balance could have been borne by Appellant and Jones, who were the two shareholders at the time Wise left NNMOC. Thus, Appellant was not obligated to allocate the balance to himself. However, Appellees testified that the monthly shareholder allocation sheets, including the one reflecting Wise's negative balance, were completed and/or brought to shareholder meetings by Appellant, and NNMOC's accountant testified that although she provided drafts of the allocation sheets to Appellant, Appellant completed them. The allocation sheet in question was completed in early 2008, nearly two years before Appellant stopped working at NNMOC in January 2010, and nearly four years before trial. This evidence supports the district court's finding that Appellant was responsible for the allocation of Wise's negative balance to himself and that he failed to correct any error for nearly four years.

### 4. Improper Allocation of Jones's Revenue

**{58}** Finally, Appellant argues that the compensatory damages award must be adjusted because revenue generated by Jones before he was a shareholder was improperly allocated to Jones by Street. He maintains that accounts receivable based on Jones's work as a non-shareholder employee physician should have been allocated to Appellant and Wise, rather than credited to Jones as either direct physician gross revenue or non-shareholder employee physician revenue. Appellant testified at trial that the effect of this adjustment would be a reduction of $75,303 in the amount Appellant owes in compensatory damages. Appellees argue that the amount allocated to Jones on the shareholder allocation sheets by Street had already been adjusted to exclude revenues generated by Jones before he was shareholder and, therefore, no further adjustment is necessary.

**{59}** Under our standard of review of damages awards, we review the record and affirm the district court's findings as to the treatment of revenue attributed to Jones if there is substantial evidence to support them. *See Miller*, 2014-NMCA-053, ¶ 28 (stating that damages awards are reviewed for substantial evidence). The district court made only one finding of fact related to the allocation of revenues to Jones. That finding states,

18

> When . . . Jones executed his [s]hareholder [e]mployment [a]greement, that [a]greement superseded his prior [e]mployment [a]greement under the terms of his [s]hareholder [e]mployment [a]greement and he is entitled to his proportionate share of all [a]ncillary [s]ervices and [n]on-[s]hareholder [p]hysician revenues, there being no limitation language in his [a]greement.

**{60}**   This finding states only that Jones is entitled to a proportionate share of revenue from ancillary services and non-shareholder employee physician services. It does not address whether Jones was or was not credited with direct physician gross revenue generated before he was a shareholder. This finding is supported by the text of the shareholder employment agreement, in which we too find no language preventing the allocation of those revenues to Jones. *See Maestas v. Martinez*, 1988-NMCA-020, ¶ 15, 107 N.M. 91, 752 P.2d 1107 ("Where an issue to be determined rests upon the interpretation of documentary evidence, an appellate court is in as good a position as the trial court to determine the facts and draw its own conclusions.").

**{61}**   To the extent we might infer from the district court's acceptance of Street's testimony as to the total amount Appellant owes NNMOC that it found that the revenue allocated to Jones had already been adjusted to exclude revenue earned before he was a shareholder, we conclude that the evidence does not support such a finding, even viewed in the light most favorable to the judgment. *See Weidler v. Big J Enters., Inc.*, 1998-NMCA-021, ¶ 30, 124 N.M. 591, 953 P.2d 1089 ("In reviewing a sufficiency of the evidence claim, this Court views the evidence in a light most favorable to the prevailing party and disregard[s] any inferences and evidence to the contrary." (alteration in original) (internal quotation marks and citation omitted)). Street testified that NNMOC "may have made an adjustment" to exclude Jones's non-shareholder employee revenue from Jones's compensation. He based his statement that such an adjustment may have been made on his review, apparently on the witness stand, of shareholder allocation sheets for the first six months that Jones was a shareholder. In this review, he noted that the revenue allocated to Jones in the first two months after becoming a shareholder was significantly less than that in the following four months, and stated that "there is indication that the revenue reflected . . . may have been adjusted based on the amounts [for the first two months] compared to the subsequent [four months]." But Street also acknowledged that he "didn't ask or didn't test that" question as part of his analysis and that he "[didn't] know if [NNMOC made] an adjustment." This testimony is too speculative to amount to substantial evidence.

**{62}**   Nevertheless, we conclude that remand for recalculation is appropriate. Based on the district court's finding that Jones is entitled to a portion of non-shareholder physician revenue, including that generated by him, we next examine the record for evidence indicating that amount and whether he was properly credited with it. The district court did not make an explicit finding as to the amount that should have been allocated to Jones and, as discussed above, we cannot infer that the amounts shown on the allocation sheets were adjusted properly. Confusingly, on the allocation sheets admitted at trial, on which both

Appellant and Street relied, the revenues allocated to Jones are labeled as "direct physician revenue," and there is no line item indicating how much revenue was attributed to Jones from his services rendered as a non-shareholder, although other non-shareholder physician revenues are identified by physician name. Given that there is no specific finding as to the correct amount of non-shareholder physician revenue that should have been allocated to Jones and that "[a]s an appellate court, we will not originally determine the questions of fact[,]" we remand for calculation of the amounts attributable to Jones's direct physician revenue and his portion of the non-shareholder physician revenue, including that generated by him prior to becoming a shareholder. *Guidry v. Petty Concrete Co.*, 1967-NMSC-048, ¶ 13, 77 N.M. 531, 424 P.2d 806.

## 5.     Shareholder Approval of Bonuses

**{63}**     Appellant next challenges the district court's finding that there was no "corroborating evidence or testimony to support [Appellant's] contention that [NNMOC] owed him any amount for loans, or that the other [s]hareholders agreed to give him any bonus or other payment inconsistent with the . . . [s]hareholder [e]mployment [a]greement." Jones testified that "[u]nder no circumstances other than those in the [shareholder e]mployment [a]greement have [the NNMOC shareholders] ever okayed any bonus for any partner." Bair testified to the effect that bonuses were not given to shareholders just for doing a good job because "[t]hat's not how the corporation was set up." He also stated that he never discussed with Appellant any monies Appellant claimed were owed to him by NNMOC. Street testified that he did not find any "loans for capital contributions made in 2008 reflected on the financial statements for the year ended December 31, 2008, from [Appellant]." We conclude that the district court's finding is supported by substantial evidence.

## B.     Punitive Damages

**{64}**     Appellant argues that "because not even nominal damages were awarded on the fraud claims the punitive damages award is erroneous." *See* UJI 13-1827 NMRA (permitting a jury to award punitive damages "only if" it finds the plaintiff "should recover compensatory [or nominal] damages." (alteration in original)). We are unpersuaded for two reasons: (1) punitive damages are appropriate when an actor willfully breaches fiduciary duties and Appellant's acts in overpaying himself fit that category, and (2) Appellant's argument is based on the faulty premise that money damages are the only available remedies for fraud.

**{65}**     First, New Mexico does not require a finding of fraud in the classical sense to support a punitive damage award. *See Akins v. United Steel Workers of Am.*, 2010-NMSC-031, ¶ 28 n.3, 148 N.M. 442, 237 P.3d 744 (allowing punitive damages for breach of duty of fair representation); *Skeen v. Boyles*, 2009-NMCA-080, ¶¶ 36-38, 146 N.M. 627, 213 P.3d 531 (allowing punitive damages for egregious breach of well-sharing agreement). And it is settled in New Mexico that punitive damages are available for breaches of fiduciary duties owed by and between shareholders in close corporations. *Walta*, 2002-NMCA-015, ¶¶ 55-58. The most salient question to be considered in any case in which punitive damages are

requested is whether the actor acted with a culpable mental state. *Id.* ¶¶ 57-58.

**{66}** Here, the district court made a number of relevant factual findings concerning overpayments of bonuses to Appellant that Appellant does not challenge. The district court found that Appellant maintained control of the financial aspects of NNMOC at least until the beginning of 2010. Thus, Appellant alone determined the bonuses to be paid to shareholders of NNMOC. His decisions were not subject to review by NNMOC's external accountant because of limitations he placed on her. Appellant provided a single shareholder allocation sheet at meetings with the other shareholders, and the single sheet was always retrieved by Appellant after the meeting. The shareholder allocation sheets were not kept as part of the financial records of NNMOC. Although the sheets were prepared in part by the NNMOC accountant, Appellant adjusted the entries to and sometimes changed the format of the sheets without input from her. These sheets were often inaccurate and misleading.

**{67}** In 2008 and 2009 Appellant gave himself bonuses that were in excess of and not related to the amounts he had billed and collected from services provided. The excess bonuses totaled approximately $370,000 by the end of 2009. The bonuses were not approved by the other shareholders. In fact, the excess bonuses were not discovered until Appellees' forensic accounting expert found them during the litigation.

**{68}** It is reasonable to infer from those findings of fact that Appellant knowingly overpaid himself; that he used his control of corporate finances to do so; that he intentionally and successfully hid the overpayments from his fellow shareholders and NNMOC's accountant; and that he was aware the overpayments were detrimental to the economic health of NNMOC and his fellow shareholders. The district court came to the same conclusion as evidenced by its findings and conclusions of law. The picture painted by the Appellant's self-dealing with regard to his excess bonuses supports the district court's conclusions that:

13. The actions of [Appellant] in regard to each of Jones, Bair[,] and Schulhofer after becoming shareholders in [NNMOC] constitute continuing fraud by [Appellant] on each of them and [NNMOC].

14. The actions of [Appellant] subsequent to Jones, Bair[,] and Schulhofer becoming shareholders in [NNMOC] constitute a breach of fiduciary duty by [Appellant] to each of them and [NNMOC].

. . . .

17. [Appellant's] misrepresentations to . . . Jones, Bair[,] and Schulhofer constitute knowing misrepresentations to them and [NNMOC].

. . . .

19. [Appellant] committed fraud and continuing fraud against . . . Jones,

21

Bair[,] and Schulhofer and [NNMOC].

20. [Appellant] breached his [f]iduciary duty to act with loyalty, utmost good faith, and inherent fairness towards his fellow shareholders and [NNMOC].

. . . .

24. [NNMOC] is a close corporation and the [s]hareholders owe each other a fiduciary duty higher than the duty of good faith and fair dealing imposed on all contractual relationships, which fiduciary duty was breached by [Appellant].

25. The fiduciary duty between [s]hareholders of a close corporation to each other and to [NNMOC] is one of loyalty, good faith, . . . inherent fairness[,] and the obligation not to profit at the expense of [NNMOC], which fiduciary duty was breached by [Appellant].

These conclusions of law and their supporting factual findings obviously carry with them the culpable mental state required to support an award of punitive damages.

{69} In addition, money damages are not the only remedy for fraud. Here, Appellees requested declaratory judgment as to the deferred compensation clause. Specifically, Appellees sought a statement that the deferred compensation clause in Appellant's shareholder employment agreement has no effect to the extent that it differs from the deferred compensation clause in Appellees' agreements. Thus, Appellees' request was not so much for a declaration of their "rights, status[,] and other legal relations" but rather for modification of Appellant's deferred compensation clause to match theirs. *See* NMSA 1978, § 44-6-2 (1975). We conclude that the remedy sought was an equitable one. A declaratory judgment action may sound in either law or equity.

> An action for a declaratory judgment is sui generis, and whether an action is to be treated as one at law or one in equity is to be determined by the nature of the dispute. . . . [D]eclaratory judgment actions, being statutory creatures, are neither inherently legal nor inherently equitable but may depend upon equitable considerations. The legal or equitable nature of a declaratory judgment proceeding is to be determined by the pleadings, the relief sought, and the nature of each case.

22A Am. Jur. 2d *Declaratory Judgments* § 2 (2004) (footnotes omitted). Because Appellees sought not to avoid the obligations of Appellant's agreement altogether but to make his agreement congruent with theirs, their request falls squarely within the definition of contract reformation, which is "[a]n equitable remedy by which a court will modify a written agreement to reflect the actual intent of the parties, usu[ally] to correct fraud or mutual

22

mistake in the writing[.]" *Black's Law Dictionary* 1394 (9th ed. 2009). Reformation is a remedy for fraud. *See Chromo Mountain Ranch P'ship v. Gonzales*, 1984-NMSC-058, ¶¶ 6, 9, 101 N.M. 298, 681 P.2d 724 (stating that "reformation is the proper remedy for constructive fraud regarding a land sale contract" and citing the Restatement (Second) of Contracts § 166 (1979)); *Buck v. Mountain States Inv. Corp.*, 1966-NMSC-090, ¶ 7, 76 N.M. 261, 414 P.2d 491 ("[A] court of equity may grant reformation of a contract where . . . through mistake on the part of one party and fraud . . . on the part of the other party, the written instrument drafted to evidence a contract fails to express the real agreement and intentions of the parties."); *Pacheco v. Martinez*, 1981-NMCA-116, ¶ 32, 97 N.M. 37, 636 P.2d 308 (stating that reformation is an equitable remedy); Restatement (Second) of Contracts § 166 (1981) ("If a party's manifestation of assent is induced by the other party's fraudulent misrepresentation as to the contents or effect of a writing evidencing . . . an agreement, the court . . . may reform the writing to express the terms of the agreement as asserted . . . if the recipient was justified in relying on the misrepresentation[.]"). The district court granted Appellees' request in the final judgment.

**{70}** Having concluded that Appellees were granted equitable relief, we next address whether such relief may form the basis for an award of punitive damages and conclude that it can. In *Madrid v. Marquez*, Mr. and Mrs. Madrid, an elderly couple, agreed to transfer their home to their neighbor, Marquez, in exchange for his promise to care for them and to let them live in the home rent free for the rest of their lives. 2001-NMCA-087, ¶ 2, 131 N.M. 132, 33 P.3d 683. After Marquez obtained the deed to the Madrids' home, he "began harassing, threatening, and intimidating the elderly and ill couple and ultimately attempted to force the Madrids from their home." *Id.* After a bench trial, the district court ordered the deed rescinded or reformed such that the Madrids would retain a life estate in the home with a remainder interest in Marquez. *Id.* ¶ 1. It also awarded $20,000 in punitive damages. *Id.*

**{71}** On appeal, Marquez made the same argument that Appellant makes here, that "punitive damages cannot be recovered without recovery of compensatory or nominal damages." *Id.* ¶ 3. While this Court agreed that "Marquez correctly state[d] the general law of New Mexico regarding punitive damages," it nevertheless held that "justice is better served by allowing the award of punitive damages in those equity cases where the conduct of the wrongdoer warrants [such] damages in order to deter clearly unacceptable behavior." *Id.* Under this so-called "modern approach . . . [r]equiring an award of compensatory damages as a prerequisite to an award for punitive damages is a technical rule that should not be applied blindly[.]" *Id.* ¶ 8. Noting that the purpose of the rule requiring compensatory or nominal damages "is that it first insures that some legally protected interest has been invaded [and] prevents the assessment of punitive damages against one who may have caused damage without legal injury[,]" this Court held that "[t]here is no reason why an award of equitable relief may not fulfill this same function[.]" *Id.* (internal quotation marks and citation omitted). Thus, where "[a] plaintiff [has] establish[ed] a cause of action in equity and the wrongdoer's misconduct [is] willful, wanton, malicious, reckless, . . . or fraudulent and in bad faith" punitive damages are allowable to "do[] complete justice." *Id.* (internal quotation marks and citation omitted).

**{72}**     Here, in awarding the equitable remedy of modification of Appellant's deferred compensation clause, the district court acknowledged the legal injury to Appellees due to Appellant's fraudulent misrepresentation. The next inquiry is whether the evidence supports the district court's findings that Appellant had a culpable state of mind related to the fraud, which Appellant challenges.  In addition to the evidence discussed above related to Appellees' reliance on Appellant's representations, the evidence supports an inference that Appellant not only knew about, but actively engineered a better deferred compensation clause for himself than for the other shareholders.  For instance, there were several email exchanges in September 2007 between Appellant and the NNMOC attorney, who was also Appellant's personal attorney, in which the attorney highlighted the differences between Appellant's shareholder employment agreement and Jones's agreement.  The fact that Appellant told Bair that he did not intend to enforce the deferred compensation clause, but included it in his agreement in case Appellees formed a different company without him indicates that he was aware of the differences in the agreements at the time they were drafted.  The evidence also supports an inference that Appellant acted to hide the differences in the deferred compensation clauses from Appellees.  For example, although Schulhofer and Bair asked Appellant about the terms of the agreements, Appellant did not tell them about the deferred compensation clause in his agreement.  Several people testified that Appellant kept the corporate documents, including the shareholders' agreements, in his possession and that no corporate documents were kept at the NNMOC offices.  This evidence is sufficient to support the district court's findings to the effect that Appellant knowingly and intentionally misled Appellees about the shareholder employment agreements.

**{73}**     We conclude that, under *Madrid*, the equitable remedy provides an independent basis supporting the award of punitive damages. The final judgment acknowledged that Appellees established a cause of action in equity and the evidence supports a finding of a culpable state of mind.  Together, these elements are sufficient to support an award of punitive damages. *See id.*  Consequently, we affirm on this issue.

**CONCLUSION**

**{74}**     We affirm the district court's judgment with two exceptions.  For the reasons stated above, the finding of a prima facie tort is reversed.  As to the amount of compensatory damages due to NNMOC, we affirm the district court's findings as to calculations of the damages in all respects except for the calculation and allocation of non-shareholder employee revenue generated by Jones before he became an NNMOC shareholder.  We remand for recalculation of this amount.

**{75}     IT IS SO ORDERED.**

_____

**MICHAEL D. BUSTAMANTE, Judge**

**WE CONCUR:**

_____

**RODERICK T. KENNEDY, Chief Judge**


_____

**LINDA M. VANZI, Judge**

25